IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ANDREA PANKRATZ, as Personal Representative
Of the Estate of Eric Gabriel Padilla, deceased,
and P.P., a minor child, by and through her
mother and next of friend Andrea Pankratz,
Plaintiffs,

vs.

No. 2:21-CV-00655-MV-GJF

THE BOARD OF COUNTY COMMISSIONERS
FOR ROOSEVELT COUNTY, a political sub-
Division of the State of New Mexico, et al.,
Defendants

**PLAINTIFFS RESPONSE TO "DEFENDANTS BOARD OF COUNTY COMMISSIONERS FOR ROOSEVELT COUNTY, JUSTIN PORTER, MATTHEW VIGIL AND JESUS LAVELLE [LAVALLE]'S (SIC) MOTION FOR SUMMARY JUDGMENT AND MEORANDUM(SIC) IN SUPPORT"**

**RESPONSE TO "STATEMENT OF MATERIAL FACTS"**

1. The allegations contained in paragraphs 1, 2,3, 5, 8, 16, 20, 21, 28, 29, 30, and 38 are admitted for the purposes of this Motion for Summary Judgment.

2. There are material issues of fact in dispute regarding paragraph **4**:

i. The "Receiving Screening" had a "Mental Health and Suicide Risk Screening" which required Mr. Padilla to be placed on Suicide watch and an emergency referral to a Mental Health Professional. [Plaintiff's Exhibit 1, pg. 6, and 8].

ii. The "Receiving Screening" noted that Mr. Padilla had been a victim of sexual abuse. [Plaintiff's Exhibit 1, pg. 7].

iii. Mr. Padilla was a moderately high suicide risk during the entire time he was incarcerated at the Roosevelt County Detention Center beginning March, 18th, 2020 because "he had a prior history of suicide attempt and prior history of suicidal ideation and the—the risk

psychosocial factors of not having being able to—not having any contact with his six-year-old daughter, and because of the fact that he was actively expressing suicidal ideation on March 18, 19 and 20. So all of these contributed to [the] assessment that he was at increased risk when he entered the jail, and he remained so, because none of these things have changed,...none of the stable risk factors have changed and he continued to be depressed while in detention."[Plaintiff's Exhibit 4, pg. 36, ¶¶4-25, pg. 37, ¶¶1-5].

iv. Ms. Skelton did not follow the jail policy by making an urgent referral to a mental health professional. [Plaintiff's Exhibit 4, pg. 37, ¶23-25; Plaintiff's Exhibit 5, pg. 83, ¶3].

v. "The screener never inquired about his past suicidal ideation and attempts. A past suicide attempt is the single most predictor of suicide. A prior attempt increases the suicide vulnerability of a detainee. He attempted/threatened suicide with a screwdriver in June 2019. Moreover, he had persistent suicidal ideation since then and such ideation was prominent at his entry into the jail." [Plaintiff's Exhibit 4, pg. 70, ¶¶14-21; Plaintiff's Exhibit 5, ¶3].

3. There are material issues of fact in dispute regarding paragraph **6**:

i. Roy Abril is a marriage and family therapist who is not able to prescribe any drugs or hold himself out as a psychologist [Doc.66-2, pg. 35, ¶6-15]

ii. He performed "nonmedical counseling services, which is basically solution focused group therapy. He did not maintain progress notes or treatment plans. [Doc. 66-2, pg. 26¶¶2-10].

iii. Roy Abril never heard of the term "qualified mental health professional" before he went to work at Wellpath. [Doc. 66-2, pg. 37, ¶¶23-25, pg. 38, ¶1].

iv. No referral to a mental health professional was done upon completion of the receiving and screening form. [Plaintiff's Exhibit 4, pg. 25, ¶¶22-25, pg. 26, ¶¶1-3, 9-10

4. There are material issues of fact in dispute regarding paragraph **7**:

i. Mr. Abril never saw or assessed Mr. Padilla on March 18th, 2020. [Plaintiff's Exhibit 1, pg. 8].

5. There are material issues of fact in dispute regarding paragraph **9**:

i. The only thing that had changed between March 18th, 2020 (the date of Mr. Padilla's admission), and March 20th, 2020 (the day he was released to general population was that he had filled out a "reasons for Living Inventory." [Plaintiff's Exhibit 3, pg. 16].

ii. "The Reasons for Living Inventory" scored fifteen out of a possible 25 questions. However, Mr. Padilla still appeared suicidal on ten different questions. [ *Id.*].

iii. "Mr. Abril did not use appropriate professional judgment on March 20th, 2020, when he decided that no referral to psychiatry, medical or special needs was indicated."[Plaintiff's Exhibit 4, pg. 62, ¶¶15-21, pg. 63, ¶¶3-10;Plaintiff's Exhibit 5, pg. 83, ¶5].

iv. "Failure to refer Mr. Padilla for suicide risk assessment, premature release of Mr. Padilla without taking appropriate and medically necessary steps to mitigate his suicide risk and failure to refer him for a psychiatric evaluation were substantial deviations from the standard of care. Such acts were objectively unreasonable." [Plaintiff's Exhibit 4, pg. 39, ¶¶3-21; Plaintiff's Exhibit 5, pg. 83-84, ¶7].

v. The transfer was premature. [Plaintiff's Exhibit 4, pg. 37, ¶18-19; pg. 52, ¶¶2-11].

6. There are material issues of fact in dispute regarding paragraph **10**:

i. Mr. Abril's "assessment" was deficient because not all the risk factors were considered including that "he made a suicide attempt back in June, 2009, he had a significant clinical history of depression and he was in psychiatric treatment and that he had psychosocial factors of missing his six-year-old child. And the fact that he had been continuously expressing suicidal ideations during the preceding six months, none of these factors were taken into account when Mr. Abril discontinued the suicide watch and moved him on to the general population." [Plaintiff's Exhibit 4, pg. 28, ¶¶13-25, pg. 29, ¶¶1-8].

7. There are material issues of fact in dispute regarding paragraph **11**:

i. There was no follow up according to the Wellpath manual, Mr. Padilla should have been followed up the next day, the third day and the seventh day. The follow up requirements after discontinuation of suicide watch were not performed at all. Mr. Padilla should have been placed on a special needs list or assigned a special needs category which was not done. The procedures to mitigate the suicide risk were not performed. [Plaintiff's Exhibit 4, pg. 29, ¶¶24-25, pg. 30, ¶¶1-13].

8. There are material issues of fact in dispute regarding paragraph **12**:

i. Mr. Padilla expressed concern on July 10th, 2020 that his medication was not working. It was not until July 22nd, that he was seen by a nurse practitioner. [Plaintiff's Exhibit 4, pg. 31, ¶¶13-17].

ii. There was no suicide risk assessment on July 22nd, only medical management. None of the factual aspects of suicide risk assessment were properly identified. [Plaintiff's Exhibit 4, pg. 31, ¶¶18-23].

9. There are material issues of fact in dispute regarding paragraph **13**:

i. Mr. Padilla was seen by a nurse practitioner not a psychiatrist on July 22nd, and again on September 2nd. A suicide risk assessment should have been completed both visits, and he should have been under care for monitoring suicidal ideation. [Plaintiff's Exhibit 4, pg. 32, ¶¶13-25]

ii. A delay of twelve days "is unacceptable particularly for an inmate who was previously suicidal." [Plaintiff's Exhibit 5, pg. 84, ¶8]

10. There are material issues of fact in dispute regarding paragraph **14**:

i. The allegations from paragraph 9 are incorporated herein by reference as if set forth in full herein.

ii. Mr. Padilla was never referred to a psychologist or psychiatrist for an appropriate suicide assessment. [Plaintiff's Exhibit 4, pg. 38, ¶¶20-24, Exhibit 5, pg. 83, ¶4].

iii. The Nurse Practitioner incorrectly noted that Mr. Padilla had no history of substance abuse, no prior suicide attempt and no prior medication history. [Plaintiff's Exhibit 5, pg. 81].

11. There are material issues of fact in dispute regarding paragraph **15**:

i. Mr. Padilla was not seen for medication management after the September 2nd, 2020 visit and his death. He did not receive any visit by a mental health provider either. [Plaintiff's Exhibit 4, pg. 33, ¶¶19-25; Plaintiff's Exhibit 5, pg. 82].

12. There are material issues of fact in dispute regarding paragraph **17**:

i. Mr. Padilla was not seen for medication management after September 2nd, 2020. [Plaintiff's Exhibit 4, pg. 33, ¶¶19-25].

ii. Nobody sat down with Mr. Padilla to determine why he missed 55 medication hand-outs. [Plaintiff's Exhibit 4, pg. 34, ¶¶2-23].

iii. "Mr. Padilla did not receive any visit by a mental health professional after September 2, 2020, before his death on November 11, 2020. Monthly psychiatric/mental health visits are standard for an inmate/patient who was clinically depressed with suicide risk." [Plaintiff's Exhibit 5, pg. 84,¶9].

iv. "Mr. Padilla received inadequate medical care for his Diabetes Mellitus by an inadequately qualified individual who failed to consult with an appropriately credentialed specialist, an internist. His unstable Diabetes Mellitus not only caused several physical symptoms including pain but it contributed to his stress and potential suicide risk."[Plaintiff's Exhibit 4, pg. 40, ¶¶12-25; pg. 41, ¶¶1-3Plaintiff's Exhibit 5, pg. 84,¶10].

v. "The inadequate medical and psychiatric care directly and proximately caused or contributed to the death of Mr. Padilla on November 11th, 2020. [Plaintiff's Exhibit 4, pg. 41, ¶¶4-23; Plaintiff's Exhibit 5, pg. 84 ¶11].

vi. "Roosevelt County Jail was inadequately staffed with mental health professionals and other clinical staff necessary to provide appropriate care to mentally ill inmates at the time when Mr. Padilla, a seriously mentally ill inmate with severe medical conditions, was detained." [Plaintiff's Exhibit 5, pg. 84, ¶1].

vii. "Roosevelt County Jail and Wellpath violated the agreement with regard to medical and mental health care of inmates such as Mr. Padilla. Furthermore, the jail and Wellpath did not comply with the national standards including NCCHC. The detention administrators and Wellpath were aware of the deviations and they failed to take any remedial actions. These noncompliance and deviations directly caused and contributed to Mr. Padilla's suicide risk and

his ultimate death by suicide." [Plaintiff's Exhibit 4, pg. 48, ¶¶3-30; Plaintiff's Exhibit 5, pg. 84, ¶2].

viii. Medical passes were performed in a hurried and slip-slod manner. [Plaintiff's Exhibit 7, ¶¶1-7].

13. There are material issues of fact in dispute regarding paragraph **18:**

i. The material issues of fact from paragraph 13 iii, v, vi, vii, and viii are incorporated herein by reference as if set forth in full herein.

ii. Mr. Padilla was in a mental breakdown almost every other day between March 18th, and November 11th, 2020. [Plaintiff's Exhibit 8, pg. 127, ¶¶20-22, 25, pg. 128, pg. 128, ¶¶1-7; pg. 131, ¶¶7-10].

iii. One of the signs of suicidal behavior that Jesus Lavalle was taught includes mental breakdowns. [Plaintiff's Exhibit 8, pg. 131, ¶¶3-6].

iv. A mental health care professional should have been contacted for Mr. Padilla's mental breakdowns. [Plaintiff's Exhibit 8, pg. 131, ¶¶14-16, 19-20].

14. There are material issues of fact in dispute regarding paragraph **19**:

i. The allegations contained in paragraph 13 ii-iv are incorporated herein by reference as if set forth in full.

ii. Mr. Lavalle failed to call a health care provider during the times Mr. Padilla was emotionally upset. [Plaintiff's Exhibit 8, pg128, ¶¶20-25]

15. There are material issues of fact in dispute regarding paragraph **22**:

i. Mr. Lavalle considered the events on November 10th, 2020 "a mental breakdown by Mr. Padilla. [Plaintiff's Exhibit 8, pg., 129, ¶¶16-19, 22].

ii. Mr. Lavalle was trained to call a medical provider when a detainee was having a mental breakdown such as the one on November 10th.[Plaintiff's Exhibit 8, pg. 130, ¶¶2-6].

iii. The conversation could be distinctly heard by everybody in the POD. Eric Padilla stated "I don't even want to fucking live, I'm tired of this shit. I don't want to live no more"..."I can't stand it no more" and "I can't take it no more." Neither Lavalle or Docherty attempted to calm Mr. Padilla down. Mr. Padilla was clearly struggling and in crisis but Lavalle did not intervene or try to get him help or resources. [Plaintiff's Exhibit 7, pg. 124, ¶8].

16. There are material issues of fact in dispute regarding paragraph **23:**

i. The allegations contained in paragraph 14 above are incorporated herein by reference as if set forth in full.

ii. A referral to a mental health professional on November 10th, 2020 should have been made. [Plaintiff's Exhibit 4, pg. 67, ¶¶12-18].

iii. "When Mr. Lavelle knew that Mr. Padilla was extremely upset with his mother (loud phone call overheard by several other inmates and the deputies a few hours before he hung himself), Mr. Lavelle did not make any attempt to de-stress Mr. Padilla." [Plaintiff's Exhibit 5, pg. 86, 5 b.].

iv. Telephone calls are all tape recorded by the Detention Center. [Plaintiff's Exhibit 6, pg. 103, ¶¶17-25].

17. There are material issues of fact in dispute regarding paragraph **24:**

i. The allegations contained in paragraph 15 are incorporated herein as if set forth in full.

18. There are material issues of fact in dispute regarding paragraph **25:**

i. Mr. Lavelle should have stopped and talked to Mr. Padilla and de-stressed him about the incident. Mr. Lavelle did not provide an adequate welfare check. [Plaintiff's Exhibit 4, pg. 42, ¶¶12-23; pg. 44, ¶¶1-3, 16-19].

ii. Written policies provided that a detention officer was crucial: "When approaching an inmate who appears on the verge of suicide, first try to determine what precipitated the event. Asking questions and actively listening are skills that [can] be enhanced by training and by role playing. Being prepared to talk an inmate through a potentially dangerous episode is a skill all corrections officers should acquire. An officer can do nothing more important than saving another person's life."[Plaintiff's Exhibit 6, pg. 111, ¶¶6-14].

iii. Under written policies detention officers are supposed to look for people that are struggling, and then try to refer them to a resource. "Suicide Prevention is Everyone's Job." [Plaintiff's Exhibit 6, pg. 112, ¶¶7-24, pg. 118,¶¶11-16].

19. There are material issues of fact in dispute regarding paragraph **26**:

i. The loud telephone conversation was in the same area where Docherty and Lavalle were standing; the loud conversation could be distinctly heard. Mr. Padilla stated "I don't even want to fucking live, I'm tired of this shit. I don't want to live no more"..."I can't stand it no more" and "I can't take it no more."[Plaintiff's Exhibit 7, pg. 124, ¶8].

ii. Mr. Lavalle was aware that Mr. Padilla was emotionally upset and had a mental breakdown. [Plaintiff's Exhibit 4, pg. 43, ¶¶1-3].

20. There are material issues of fact in dispute regarding paragraph **27:**

i. The allegations contained in paragraph 13 are incorporated herein by reference as if set forth in full herein.

ii. Officers are trained in communicating with detainees to help identify people when they may be in crisis. [Plaintiff's Exhibit 6, pg. 111, ¶¶21-24].

21. There are material issues of fact in dispute regarding paragraph **31:**

i. "The 'security round' performed by Officer Lavalle at approximately 11:53 p.m. was very short and did not include speaking to anyone including Eric Padilla or determining whether anybody was in distress." Another detainee "could heard Eric Padilla's feet kicking against the wall of his cell before he was found dead. However, nobody responded to the loud kicking on the wall." [Plaintiff's Exhibit 7, ¶9].

ii. "The video camera that was supposed to be monitoring cell 29, the cell Eric Padilla occupied was not operational and had not worked for a while before November 10th and 11th, 2020." [Plaintiff's Exhibit 6, pg. 107, ¶¶19-23; Plaintiff's Exhibit 7, ¶10].

22. There are material issues of fact in dispute regarding paragraph **32:**

i. The allegations contained in paragraph 21 i are incorporated herein by reference.

ii. There was no direct observation of Mr. Padilla. [Plaintiff's Exhibit 4, pg. 35, ¶¶9-13].

iii. The welfare check by Mr. Lavelle at 2353 hours on November 10th, 2020 was a substantial deviation from the standard of care applicable to correctional officers. [Plaintiff's Exhibit 4, pg. 45, ¶¶6-10, 17-18; Plaintiff's Exhibit 5, pg. 84, ¶12

iv. There were blind spots in the day room. [Plaintiff's Exhibit 6, pg. 105, ¶¶22-25, pg. 106, ¶¶1-3].

v. When Mr. Lavalle saw the sock being thrown from the cell, he did not stop and talk with Mr. Padilla. [Plaintiff's Exhibit 4, pg. 42, ¶¶2-5].

23. There are material issues of fact in dispute regarding paragraph **33**:

i. There was inadequate staffing at the detention center on the night of November 10th, 11th, 2020 and throughout Mr. Padilla's stay which affected the frequency of the visits by mental health professionals. [Plaintiff's Exhibit 4, pg. 72, ¶¶21-25, pg. 73, ¶¶1-5, 51, ¶¶2-12].

ii. The detention center had an obligation to ensure that adequate mental health services were being implemented and provided by Wellpath. [Plaintiff's Exhibit 4, pg. 49, ¶¶10-19, 24-25, pg. 50, ¶1].

iii. "Both Roosevelt County jail and Wellpath staff were aware of Mr. Padilla's serious medical need and they consciously disregarded it, resulting in his suicide."[Plaintiff's Exhibit 4, pg. 53, ¶¶12-14, 18-25].

24. There are material issues of fact in dispute regarding paragraph **34:**

i. Mr. Padilla was not followed up after the discontinuation of the suicide watch or placed on a special needs list or category in violation of Wellpath's own policy manual. [Plaintiff's Exhibit 4, pg 30, ¶¶1-13].

ii. The welfare check by Mr. Lavalle was in violation of the NCCHC standard and also the ACA standard. [Plaintiff's Exhibit 4, pg. 45, ¶¶4-10, 17-18].

iii. "[T]he jail and Wellpath did not comply with the national standards including NCCHC. The detention administrators and Wellpath were aware of the deviations and they failed to take any remedial actions. These noncompliance and deviations directly caused and contributed to Mr. Padilla's suicide risk and his ultimate death by suicide." [Plaintiff's Exhibit 5, pg. 84, ¶2].

iv. "Both Roosevelt County Jail and Wellpath knew that they did not have an adequate suicide prevention policy. Failure to establish an adequate suicide prevention policy and

program was consistent with custom, policy and practice which resulted in the death of Mr. Padilla. In this regard, such failures became the driving force in the causation of Mr. Padilla's death." [Plaintiff's Exhibit 5, pg. 85, ¶3].

v. "The mental health providers' assessment, monitoring and treatment of Mr. Padilla regarding his suicide risk and management supports the conclusion that they were not adequately trained." [Plaintiff's Exhibit 5, pg. 85, ¶5 a)].

vi. The number of staff was woefully inadequate under the standard of care in the ACA and NCCHC. [Plaintiff's Exhibit 4, pg. 47, ¶¶1-11].

25. There are material issues of fact in dispute regarding paragraph **35:**

i. On November 10th, 2020 in the presence of Detention Officer Jesus Lavalle Mr. Padilla stated very loudly "I don't even want to fucking live, I'm tired of this shit. I don't want to live no more"..."I can't stand it no more", and I can't take it no more."[Plaintiff's Exhibit 7, ¶8].

ii. Mr. Padilla was having mental breakdowns almost every day while at the Roosevelt County Detention Center and a health care professional should have been contacted but was not." [Plaintiff's Exhibit 8, pg. 131, ¶¶7-10, 14-16, 19].

26. There are material issues of fact in dispute regarding paragraph **36:**

i. The allegations contained in paragraph 25 are incorporated herein by reference as if set forth in full herein.

27. There are material issues of fact in dispute regarding paragraph **37:**

i. Dr. Daniel is an expert on correctional practices. [Plaintiff's Exhibit 4, pg. 18, ¶¶15-17, 23-25, pg. 19, ¶¶1-5, 11-12, 15, 24, pg. 20, ¶¶2-14].

**ADDITIONAL MATERIAL FACTS PURSUANT TO N.M.LR-CIV.56.1 (b)**

A. Roosevelt County Detention Center had a duty to provide safe and secure facilities for its inmates. [Plaintiff's Exhibit 6, pg. 108, ¶¶10-23].

B. Roosevelt County Detention Center had a duty to provide medical services to the detainees. [Plaintiff's Exhibit 6, pg. 120, ¶¶9-11].

C. "[T]he primary role of a corrections officer is to provide for the safety and security of inmates. [Plaintiff's Exhibit 6, pg. 109, ¶¶5-7].

D. Suicide is one of the leading cause of death in jail. It is imperative that the correctional facility have a suicide prevention plan, and that all staff be trained on that plan. [Plaintiff's Exhibit 6, pg. 109, ¶¶19-25.].

E. There had been two prior suicide attempts during the time Justin Porter was the jail administrator. [Plaintiff's Exhibit 6, pg. 110, ¶¶2-10; pg. 117, ¶¶15-18].

F. "Most suicides in correction settings can be prevented if the correctional officials, including officers and mental health professionals follow policies, procedures and practice available to that facility and if they are perceptive to the emotional and mental needs of the inmate." [Plaintiff's Exhibit 4, pg. 77, ¶¶5-9].

G. Mr. Padilla had been a victim of sexual abuse. [Plaintiff's Exhibit 1, pg. 7].

H. There is a higher incidence of sexual abuse in their childhood among suicide victims. [Plaintiff's Exhibit 4, pg. 27, ¶¶15-18].

I. Mr. Padilla had attempted suicide in the past. [Plaintiff's Exhibit 1, pg. 14].

J. Past attempts at suicide are the single most reliable predictor of suicide. [Plaintiff's Exhibit 4, pg. 74, ¶¶18-20; Plaintiff's Exhibit 5, pg. 83, ¶3].

K. Roosevelt County Detention Center was "inadequately staffed with mental health professionals and other clinical staff necessary to provide appropriate care to mentally ill inmates. [Plaintiff's Exhibit 4, pg. 46, ¶¶3-7, 14-17, 22-23].

L. "Roosevelt County Jail and Wellpath failed to establish an adequate suicide prevention program at the jail."[Plaintiff's Exhibit 5, pg. 85, ¶3].

M. Detention Officer Lavalle had never even met the person who was supposed to be the qualified mental health provider. [Plaintiff's Exhibit 8, pg. 132, ¶¶4-8].

N. The Roosevelt Detention Center did not have adequate mental health services delivery system manifested by: a) inadequate staffing; b) inadequate monitoring of suicidal inmates; lack of systematic medication management including lack of a procedure to monitor non-compliant patients who require life sustaining medications such as SSRI and insulin; d) lack of provision for use of higher level provider including a psychiatrist and an internist; e) lack of adequate procedures and practices of obtaining and consulting inmate's prior records. [Plaintiff's Exhibit 5, pg. 85, ¶4].

O. Mr. Padilla was at risk for suicide throughout his incarceration. [Plaintiff's Exhibit 4, pg. 55, ¶¶13-20; Plaintiff's Exhibit 5, pg. 83, ¶1].

P. Mr. Padilla's diabetes mellitus was inadequately treated which caused him additional stress which is very much related to suicidal tendencies and ideation. [Plaintiff's Exhibit 4, pg. 56, ¶¶24-25, pg. 57, ¶¶3-12, pg. 64, ¶¶6-13, 15-18; pg. 65, ¶¶1-5, 11-18, 23-25, pg. 66, ¶¶1-4, 6-7, 9-11, 24-25, pg. 67, ¶¶1-6, pg. 73, ¶¶18-24; Plaintiff's Exhibit 5, pg. 83, ¶1].

Q. Mr. Padilla's progress should have been continuously monitored, yet it was not. [Plaintiff's Exhibit 4, pg. 58, ¶¶20-25, pg. 59, ¶¶1-12, pg. 60, ¶¶2-5, 7-8, 14-15, 17-21, 23-25, pg. 61, ¶¶10-25, pg. 62, ¶¶8-14; Plaintiff's Exhibit 6, pg. 113, ¶¶ 9-15].

R. Periodic suicide risk assessments of Mr. Padilla should have been completed but were not. [Plaintiff's Exhibit 4, pg. 76, ¶¶4-10].

S. Mr. Padilla was not in a suicide-resistant cell was placed in a cell with bunk beds which was not correct. [Plaintiff's Exhibit 4, pg. 75, ¶¶18-19; Plaintiff's Exhibit 6, pg. 119, ¶¶22-25].

T. Mr. Lavalle worked a 16 hour shift on November 9th, and then a 13 hour shift on the 10th. [Plaintiff's Exhibit 6, pg. 115, ¶¶2-5, pg. 116, ¶¶4-10].

U. Mr. Padilla threw a pair of socks out of his cell shortly before his death which should have been investigated further but was not. [Plaintiff's Exhibit 6, pg. 121, ¶¶10-19, pg. 122, ¶¶17-25]

V. "[T]he care and treatment including suicide risk assessment, monitoring and management of Mr. Padilla who was severely mentally ill with serious medical conditions, substantially deviated from the standard of care." [Plaintiff's Exhibit 5, pg. 86].

W. The "Roosevelt County Jail including the administration and staff, knew that it did not have an adequate suicide prevention program and mental health services delivery system including adequate mental health staff. These conditions created a "custom and practice", causing Mr. Padilla to not receive adequate and appropriate treatment to mitigate his suicide risk." [Plaintiff's Exhibit 5, pg. 86].

X. "Both the Roosevelt County Jail and Wellpath staff were aware of Mr. Padilla's serious medical need and they consciously disregarded it, resulting in his suicide."[Plaintiff's Exhibit 5, pg. 86].

Y. Lieutenant Matthew Vigil was informed of the loud telephone call Mr. Padilla had during med pass. [Plaintiff's Exhibit 9, pg. 134, ¶¶17-25, pg. 135, ¶¶1-6, 15-17].

Z. Lieutenant Vigil "had the officer make sure that they were maintaining a visual on him throughout the night." The usual standard was to refer the person to medical to speak with them or refer them to mental health. [Plaintiff's Exhibit 9, pg. 136, ¶¶1-10].

AA. Lieutenant Vigil listened to the telephone call because he was "working the floor." [Plaintiff's Exhibit 9, pg. 137, ¶¶1-4, 10-14].

BB. On November 10th-11th, 2020 there were "staffing issues." There were supposed to be five officers on duty but instead there were only four. [Plaintiff's Exhibit 9, pg. 137, ¶¶18-19, 21-22; pg. 138, ¶¶12-25].

CC. On of Lieutenant Vigil's duties was to review the cameras throughout the day.[Plaintiff's Exhibit 9, pg. 139, ¶¶7-10].

DD. An inmate kicking against the wall would be unusual and something an officer would want to investigate. [Plaintiff's Exhibit 9, pg. 140, ¶¶14-20].

**1. Inadequate medical care amounted to a deliberate indifference**

Pretrial detainees who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment with the standard for deliberate indifference at least as protective as for convicted prisoners. *See, Martin v. Bd. of County Com'rs of County of Pueblo,* 909F.2d402, 406(10th Cir. 1990). Detainees

must also be protected from serious risks to their health. *See Farmer v. Brennan,* 511U.S.825, 834, 837(1994); *Helling v. McKinney,* 509U.S.25, 33-34(1993). "The requirement of deliberate indifference is less stringent in cases involving a prisoners medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *Hudson v. McMillan,* 503U.S.1,6(1992).

In the context of cruel and unusual punishment, "[d]eliberate indifference involves both an objective and subjective component." *Olsen v. Layton Hills Mall,* 312F.3d1304, 1315(10th Cir. 2002) (quoting *Sealock v. Colorado,* 218F.3d1205, 1209(10th Cir. 2000)) (Internal quotation marks omitted). Under the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum,* 439F.3d1227, 1230(10th Cir. 2006). The subjective component requires that the official "knows of and disregards an excessive risk to inmate health or safety." *Mata v. Saiz,* 427F.3d745, 751(10th Cir. 2005). A defendant is deliberately indifferent where he "has knowledge of a substantial risk of serious harm to inmates...[and]fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar,* 516F.3d912, 916(10th Cir. 2008).

In the present matter Detention Officer Jesus Lavalle knew that Mr. Padilla was having a mental breakdown almost every other day between March 18th, and November 11th, 2020. [MIF-13 ii]. One of the signs of suicidal behavior that Mr. Lavalle was taught includes mental breakdowns. [MIF-13-iii]. On November 10th, 2020 Mr. Lavalle was personally aware of Mr. Padilla's suicidal thoughts yelled over the telephone. [MIF-35 i]A mental health care professional should have been contacted but was not called by Mr. Lavalle. [MIF-13-iv; 14 ii].

Mr. Lavalle was aware that Mr. Padilla was having a mental breakdown on November 10th, 2020. [MIF15 i, ii, iii]. Mr. Lavalle should have attempted to de-stress Mr. Padilla. [MIF-16 iii, 18 I, ii, iii]. In addition, the "security" round performed by Mr. Lavalle at around 11:53 p.m. was very short and did not include speaking to anyone including Mr. Padilla or determining whether anybody was in distress. Another detainee could hear Mr. Padilla's feet kicking against the wall of his cell before he was found dead. Nobody including Mr. Lavalle or Mr. Vigil responded. [MIF 21 i]. An inmate kicking against the wall would be unusual and something an officer would want to investigate. [AMF-DD]. The welfare check by Mr. Lavelle was a substantial deviation from the standard of care applicable to correctional officers and in violation of national standards. [MIF32 iii, 34 ii]. When Mr. Lavalle saw the sock being thrown from the cell, he did not stop and talk with Mr. Padilla. [MIF32 iv; AMF U].

To hold Jail Administrator Porter liable, Plaintiff must show that he had "actual knowledge ...of [Mr. Padilla's] substantial risk of suicide." *Cox v. Glanz,*800F.3d1249(10th Cir. 2015). That knowledge could have come from his subordinates even if he "had no personal interaction with [the prisoner] or direct and contemporaneous knowledge of his treatment." *Id.* at 1254. The jail administrator was aware that national standards regarding medical and mental health care of inmates such as Mr. Padilla however took no action to remediate the situation. This noncompliance and deviation directly caused and contributed to Mr. Padilla's suicide risk and his ultimate death by suicide. [MIF-17 vii]. Under written policies suicide prevention was everyone's job. [MIF18 iii]. The video camera that was supposed to be monitoring Mr. Padilla's cell was not operational and had not worked for a while. [MIF-31 ii]. There were blind spots in the day room according to Mr. Porter. [MIF32 iii]. The Detention Center staff was aware of Mr.

Padilla's serious medical need but consciously disregarded it, resulting in his suicide. [MIF33 iii]. The Detention Center knew that they did not have an adequate suicide prevention policy amounting to a custom, policy and practice which resulted in the death of Mr. Padilla. These failures became the driving force in the causation of Mr. Padilla's death. [MIF34 iv]. Mr. Padilla was having mental breakdowns almost every day while incarcerated but no health care professional was contacted. [MIF35 ii]. There had been two prior suicide attempts during Mr. Porter's tenure as administrator. [AMF-E]. The Detention Center staff were aware of Mr. Padilla's serious medical need and they consciously disregarded it, resulting in his suicide. [AMF-X].

Lieutenant Vigil was aware that a loud telephone call had occurred with Mr. Padilla on November 10th, 2020. [AMF-Y]. Mr. Vigil actually listened to the telephone call because he was "working the floor." [AMF-AA]. Suicidal thoughts were expressed by Mr. Padilla during the telephone call. [MIF-22 iii]. A referral to a mental health professional should have been made. [MIF-23 ii]. Suicide prevention was part of Mr. Vigil's job duties. [MIF-18 iii]. Mr. Vigil was also supposed to review the cameras throughout the day. [AMF-CC].The video camera that was supposed to be monitoring Mr. Padilla's cell was not working.[MIF21 ii]. Mr. Vigil claim that he ordered an officer to maintain a visual on his throughout the night. [AMF-Z]. It is undisputed that a continuous visual was not maintained [MIF-22 ii]. Nor was Mr. Padilla referred to medical or mental health. [MIF-23 ii]. Mr. Lavelle should have stopped and talked to Mr. Padilla and de-stressed him. [MIF-18 i].

**2. Count III-Custom and policy of violating constitutional rights:**

There was a custom and policy whereby the mentally ill were deprived of adequate medical care and humane conditions of incarceration. There was a climate of deliberate indifference to the needs of the mentally ill within the Detention Center that directly led to Mr. Padilla's suicide on November 11th, 2020. The Roosevelt County Detention Center administration knew that it did not have an adequate suicide prevention program and mental health services delivery system, including adequate mental health staff. These conditions created a "custom and practice", causing Mr. Padilla to not receive adequate and appropriate treatment and to mitigate his suicide risk. [AMF-W]. The Detention Center was aware of Mr. Padilla's serious medical need and consciously disregarded it, resulting in his suicide. [AMF-X]. Plaintiff has cited incidents, pattern of incidents, lack of training and unconstitutional policy above which is incorporated herein by reference.[MIF 12 iv, v, vi, vii; 13 ii, ii, iv, 14 ii, 15 I, ii, iii, 16 ii, iii, 18 I, ii, iii, 19 I, ii, 20 ii, 21 I, ii, 22 ii, iii, 23 ii, 24 ii, iv, vi, AMF-A, B, CK, L, N, O, P, Q, R, S, T, UV, W, X Y, Z, AA, BB.,CC, DD].

**3. Americans with Disabilities Act/Rehabilitation Act**

The Americans with Disabilities Act and Rehabilitation Act "unambiguously extend[ ] to state prison inmates." *Pa. Dep't of Corrs. V. Yeskey,* 524U.S.206, 213(1998).[1] The Defendant claims that "Plaintiff cannot establish that Mr. Padilla had a disability." [MFSJ-12]. Mr. Padilla was a moderately high suicide risk throughout his incarceration. Mr. Padilla "had an unstable diabetes mellitus with significant medical complications like edema of the foot, abdominal pain,

[1] Since the Detention Center does not receive federal funding, Plaintiff hereby consents to Summary Judgment on the Rehabilitation Act claim

nausea and infection. *See, Carter v. Pathfinder Energy Servs.,* 662F.3d1134(10th Cir. 2011)(diabetes affect the digestive and circulatory system and thus physical impairment within the meaning of the ADA is established) Mr. Padilla had been diagnosed with clinical depression and was on medication. He had high blood pressure for which he had been prescribed lisinopril. *See, Demyanovich v. Cadon Plating & Coatings, L.L.C.,* 747F.3d419(6th Cir. 2014) (Employee alleging disability discrimination under ADA was "disabled" in that his heart condition and diabetes substantially limited several major life activities, including standing, walking, and bending.). Next, the Defendant claims that "Plaintiff has no evidence to support a claim that Mr. Padilla was precluded from participation in the provision of medical services or any other service within the Detention Center." [MFSJ-12]. Mr. Padilla was not put on a special needs list or any procedures used to mitigate the risk of suicide. Mr. Padilla was never referred to a psychologist or psychiatrist for an appropriate suicide assessment. Nobody determined why Mr. Padilla had missed 55 medication hand-outs. No monthly psychiatric/mental health visits were performed. Mr. Padilla received inadequate medical care for his diabetes mellitus. The Defendant was inadequately staffed with mental health professionals and other clinical staff necessary to provide appropriate care to Mr. Padilla who was a seriously mentally ill inmate with severe medical conditions. A mental health professional should have been contacted for Mr. Padilla's almost every other day mental breakdowns. No medical provider was called for the November 10th, 2020 mental breakdown by Mr. Padilla. Finally, the Defendant claims "there is no evidence to support the claim of an alleged failure to accommodate." The Detention Center was aware of Mr. Padilla's serious medical need but consciously disregarded it, resulting in his suicide. Mr. Padilla was not followed up after the discontinuation of the suicide watch or

placed on a special needs list or category. There was no adequate suicide prevention policy. [MIF24 iv]. There was inadequate training. The number of staff was woefully inadequate. A health care professional should have been contacted during Mr. Padilla's almost every day mental breakdowns, but no provider was contacted. The Detention Center did not have an adequate mental health services delivery system.

**4. State law claims:**

The Defendant claims that the "State law claims are barred because Mr. Padilla's suicide is an independent intervening cause of his death."[MFSJ-13]. New Mexico appellate courts have "virtually eliminated" the doctrine's application in cases involving only negligent, as opposed to intentional conduct. *Silva v. Lovelace Health Sys., Inc.,* 2014-NMCA-086, ¶14, 331P.3d958. As discussed above, there was subjective knowledge of a substantial risk of suicide by the Detention Center Defendant. Plaintiff has presented significant evidence that Mr. Padilla's suicide was foreseeable by the Detention Center Defendants. Mr. Padilla was at risk for suicide throughout his stay. [AMF-O].The Defendant had a duty to provide medical services to detainees.[AMF-B]. The Detention Center did not have adequate mental health services delivery system in place. [AMF-N].The Detention Center including the administration and staff, knew that it did not have an adequate suicide prevention program and mental health services delivery system.[AMF-W]. They were aware of Mr. Padilla's serious medical need but consciously disregarded it, resulting in his suicide. [AMF-X]. The Defendant next claims that the Defendant is entitled to sovereign immunity because it contracted for medical care.[MFSJ-14]. As noted above the Defendant had a duty to provide not only a safe and secure facility, but also to provide medical services to detainees.[AMF-A,B, and C]. Next, the Defendant claims that

"Plaintiff cannot establish any claim in (sic) negligence against these Defendants because Plaintiff has no witness to testify concerning the relevant standard of care in detention center practices. Dr. Daniel's has testified at length regarding his background in correctional practices. [MIF 27 i].

**<u>Operation of maintenance of the building, equipment and furnishings 41-4-6:</u>**

Section 41-4-6 waives immunity where due to the alleged negligence of public employees, an injury arises from an unsafe, dangerous, or defective condition on property the government owns and operates. *Callaway v. New Mexico Dept. of Corrections,* 1994-NMCA-049, ¶15, 117 N. M.637, 875P.2d393 (premises liability waiver found for roaming gang members with access to weapons). Liability under Section 41-4-6 arises not just from the maintenance of the property, but also from the operation of the property. *Id.*

The Defendant claims that its lack of provision of proper health care only threatened Plaintiff. [MFSJ-14-15]. There is evidence "of denial of medical treatment to the general prison population. [MIF-12 vi, 12 vii,12 viii]. No video camera was monitoring Mr. Padilla. [MIF 21ii, iii]. The Detention Center was inadequately staffed. [MIF-23 I, 24 vi; AMF-K, N]. In addition, the Detention Center had a duty to provide safe and secure facilities to its inmates. [AMF-A]. Mr. Padilla was not in a suicide-resistant cell. [AMF-S].

***<u>Roosevelt County Detention Center is liable under 41-4-10:</u>***

The Administrator of the Detention Center Justin Porter has admitted that the Roosevelt County Detention Center had a duty to provide medical services to the detainees. [AMF-B].The Detention Center had an obligation to ensure that adequate mental health services were being

implemented and provided by Wellpath. [MIF-23 ii]. Detention officers were taught to spot the signs of suicidal behavior and seek the intervention of a health care provider. [MIF-13 iii, 15ii]. Written policies provided officers to engage those with suicidal propensities. [MIF-18i-iii]. The Detention Center was permitted by law to provide medical services to the detainees, but failed miserably in the provision of such services.

***<u>Roosevelt County Detention Center is liable under 41-4-6 and 41-4-12:</u>***

Law enforcement officers may be sued for negligence in "the operation or maintenance of...equipment" under Section 41-4-6. *See, Smith v. Vill. of Ruidoso,* 1999-NMCA-151, ¶ 28, 128N.M.470, 994P.2d50. Telephone calls such as the one on November 10th, 2020 where Mr. Padilla was exhibiting suicidal behavior are recorded and monitored by the Detention Center. [MIF-17 iv, 19 I, AMF-AA]. Lieutenant Vigil "had the officer make sure that they were maintaining a visual on him throughout the night." [AMF-Z]. However, that was impossible because the video camera that was supposed to monitor Mr. Padilla was not operational and had not worked for a while. [MIF 21 ii]. In addition, there were blind spots in the day room. [MIF-22 iii]. Mr. Padilla was not in a suicide-resistant cell. [AMF-S].

**<u>5. Loss of Consortium</u>** As set forth above, there is underlying liability against the Defendants. Thus, the Defendants are liable to the Estate and to the minor child. A derivative claim against the Defendants has been stated.

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff asks that the Motion for Summary Judgment be denied and this matter set for trial on the merits.

Respectfully Submitted:

/s/ Eric D. Dixon

Eric D. Dixon
Attorney and Counselor at Law, P.A.
301 South Avenue A,
Portales, New Mexico, 88130
(575) 359-1233
Facsimile: (575) 356-4946
e-mail: eric@ericdixonlaw.net
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on the 6th day of June, 2022, I filed the foregoing electronically through the Court's electronic filing system which caused opposing counsel to be served with a copy of the foregoing pleading.

/s/ Eric D. Dixon

Eric D. Dixon