**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

ANDREA PANKRATZ, as Personal Representative
of the Estate of Eric Gabriel Padilla, deceased,
and P.P., a minor child, by and through her mother and Next
Friend of Andrea Pankratz,

Plaintiffs,

vs. No. 2:21-cv-00655 MV/GJF

THE BOARD OF COUNTY COMMISSIONERS
FOR ROOSEVELT COUNTY, a political sub-
division of the State of New Mexico, JUSTIN
PORTER, LIEUTENANT MATHEW VIGIL,
DETENTION OFFICER JESUS LAVALLE,
in their individual capacities, and
WELLPATH LLC, formerly known as
CORRECT CARE SOLUTIONS, LLC,

Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on (1) the Motion for Summary Judgment Requesting Dismissal of Counts I, III, V, and VI ("Motion for Summary Judgment") filed on May 27, 2022, by the Board of County Commissioners for Roosevelt County ("County") and three of its correctional officer employees, Justin Porter, Matthew Vigil, and Jesus Lavalle (collectively "County Defendants") [Doc. 83], with respect to the First Amended Civil Complaint for Damages ("Amended Complaint") [Doc. 18] filed on August 26, 2021, by Andrea Pankratz, acting as personal representative of the estate of Eric Padilla, and P.P., Mr. Padilla's minor child, acting by and through her mother and next of friend Ms. Pankratz as well as their undersigned attorney, Eric. D. Dixon (collectively "Plaintiffs") and (2) the Motion in Limine to Exclude Opinions of Dr.

Anasseril E. Daniel and Notice of Joinder in Motion to Exclude Plaintiff's Expert William Patterson, III ("Motion to Exclude") filed on May 31, 2022, by County Defendants [Doc. 89]. The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the Motion to Exclude is partially well-taken and will be granted in part, and the Motion for Summary Judgment will be granted.

**BACKGROUND**

When viewed in the light most favorable to Plaintiffs as the non-moving party at summary judgment, the facts supported by evidence are as follows. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662 (10th Cir. 2010). Eric Padilla was in custody at Roosevelt County Detention Center (RCDC) from March 18, 2020, until his death by suicide on November 11, 2020. Doc. 18 at 2, ¶¶ 1-3. RCDC is a detention center administered by Defendant Board of County Commissioners of Roosevelt County, which is responsible for operating and maintaining the facility. *Id.* at 10, ¶ 34. RCDC was not a recipient of federal funding at any point while Mr. Padilla was detained there. Doc. 83-8 at 2. At all applicable times, the now-bankrupt Wellpath LLC was the company with whom the County contracted to provide medical and mental health services at RCDC. Doc. 18 at 12, ¶ 38.

Mr. Padilla suffered from physical and mental health issues including diabetes mellitus, hypertension, and depression. *Id.* at 2-3, ¶ 5; Doc. 94 at 1-2, ¶ 2. He had a history of sexual abuse and suicidal ideation, including an alleged suicide attempt with a screwdriver in June 2019. *Id.* Mr. Padilla's health issues and history of suicidal ideation were collected by Hailey Skelton, a Licensed Nurse Practical Nurse employed by Wellpath LLC, during the "Receiving and Screening" phase of Mr. Padilla's initial booking.[1] Doc. 83 at 2, ¶ 4. Mr. Padilla reported a sense of hopelessness

[1] Nurse Skelton also spoke with the transport officer from the Clayton County Sheriff's office who accompanied Mr. Padilla to RCDC. Doc. 69-1 at 6, 17:9-18:2 (excerpt from Nurse Skelton's deposition transcript). That officer told her

and thoughts about how he would kill himself. Doc. 18 at 2-3, ¶ 5; Doc. 66-6 (intake screening); Doc. 83 at 2, ¶ 4. He also reported that he had diabetes (for which he took Glipizide), hypertension (for which he took lisinopril), and diagnosed depression (for which he took Celexa). *Id.*

As a result of this screening, Nurse Skelton placed Mr. Padilla on a suicide watch and referred him to Roy Abril, a Licensed Marriage Family Therapist employed by Wellpath, who would go on to see Mr. Padilla five times, on March 18, 2020, March 19, 2020, March 20, 2020, July 10, 2020, and July 22, 2020. Doc. 83 at 2, ¶ 6; Doc. 94 at 2-3, ¶ 3; Doc. 66-2 at 16-17, 80:15-81. Mr. Abril was identified as a "qualified mental health professional" at RCDC, where he worked part-time in addition to working as a full-time counselor at the nearby Cannon Air Force Base. In his RCDC capacity, he could provide nonmedical counseling services, including giving diagnoses from the Diagnostic Statistical Manual. Doc. 66-2 at 5-6, 22:16-23:10; Doc. 57-1 at 6, 48:4. He was not licensed to prescribe medications, and he was not required to maintain progress notes or treatment plans. Doc. 66-2 at 5-6, 22:9-23:10. Neither the initial screening questionnaire, nor Nurse Skelton, nor subsequent care providers at RCDC asked Mr. Padilla whether he had a history of actually attempting suicide and thus none of these providers was aware of his attempt to take his own life less than one year prior. Doc. 94 at ¶ 2.

Mr. Abril saw Mr. Padilla for the first documented time at 4:50 p.m. on March 19, 2020, the day after he arrived.[2] *See* Doc. 66-7 (March 19th assessment). Mr. Abril assessed Mr. Padilla

---

that Mr. Padilla had been making statements about wanting to kill himself, which was part of what put her on notice about his suicide risk. *Id.*

[2] The parties dispute whether Mr. Abril saw Mr. Padilla on March 18, 2020, the day that Nurse Skelton conducted Mr. Padilla's intake screening and referred him to Mr. Abril. *Compare* Doc. 83 at 3, ¶ 7 *with* Doc. 94 at 3, ¶ 4. The County Defendants cite Mr. Abril's deposition, in which Mr. Dixon, Attorney for Plaintiffs, asks Mr. Abril to affirm that he "saw [Mr. Padilla] on March 18th, 19th, and 20th, from the records," to which Mr. Abril replies, "Right." Doc. 66-2 at 16, 80:15-17. Even more to the point, he specifically responded, "Correct," when asked whether he did an evaluation on the 18th and maintained Mr. Padilla on suicide watch. Doc. 83-2 at 4, 105:4-7. However, just prior to that in the deposition, Mr. Dixon had asked, "it looks like you saw Mr. Padilla *four or five times, more or less*," to which Mr. Abril responded by asking whether it was the "three times" during the period when Mr. Padilla was getting evaluated.

to present a "high" risk of self-harm or suicide and checked the box indicating that Mr. Padilla had engaged in self-harm since the last assessment. *Id.* He checked the box indicating that Mr. Padilla currently presented with suicidal ideation and wrote that Mr. Padilla exhibited dysregulated emotions and aggression. *Id.* At that visit, Mr. Padilla refused to answer the questions comprising the Columbia Suicide Severity Rating Scale, and Mr. Abril observed that he was uncooperative, agitated, tearful, and angry. *Id.* Mr. Abril determined that the suicide watch should be maintained and referred Mr. Padilla for mental health follow up care. *Id.*

Mr. Abril returned around 6:45 p.m. the next day, March 20, 2020, and re-evaluated Mr. Padilla, who was more cooperative. *See* Doc. 66-9 (March 20th assessment). Mr. Padilla responded to the suicide scale questions and completed a 25-question "Reasons for Living Inventory."[3] *Id.* at 3, 5. Mr. Abril wrote in his notes that Mr. Padilla "was under the influence of [a] drug" but had "stabilized emotionally" and "display[ed] insight." *Id.* at 4. Mr. Abril also noted that Mr. Padilla reported having heard good news that his mother was going to be getting him out, and also that he had friends in general population with whom he wanted to talk. *Id.* He cited all of these facts in justifying his decision to discontinue Mr. Padilla's suicide watch and release him back to the general population, even though Mr. Padilla had checked "Yes" when asked whether he had "ever done anything, started to do anything, or prepared to do anything to end [his] life." *Id.* at 3-4. In

---

*Id.* at 17, 81:10-14. This exchange suggests that in that moment there was mutual uncertainty over whether that additional visit actually occurred. Moreover, within that initial evaluation window, there are only records on the docket for visits by Mr. Abril on the 19th and 20th, a fact to which Plaintiffs point in their Response. Doc. 94 at 3, ¶ 4 (citing Doc. 94-1 at 8) ("Mr. Abril never saw or assessed Mr. Padilla on March 18th, 2020.").

[3] Mr. Padilla checked 15 of the 25 possible reasons for living listed on the form, a fact which Mr. Abril viewed as a positive development, but which Plaintiffs frame as proof that Mr. Padilla "still appeared suicidal on ten different questions." *Compare* Doc. 66-2 at 10, 54:3-9 *with* Doc. 94 at 3, ¶ 5. The nature of the questions does not, however, support an inference that not checking a box is affirmative evidence of suicidality. For example, Mr. Padilla did not check the box listing a religious belief forbidding suicide, but that does not itself constitute a risk factor. Doc. 66-9 at 5; *c.f. id.* (not checking the box labeled "I am too stable to kill myself"). Furthermore, on the Columbia Suicide Severity Rating Scale questionnaire, Mr. Padilla responded that in the past month he had wished to be dead and had suicidal thoughts. *Id.* at 3. While he responded that at *some* point in the past he had taken steps to prepare to end his own life, he denied having had such thoughts within the last month. *Id.*

his deposition, he explained that pursuant to the Wellpath policy that he followed, the follow-up referral that he ordered during this evaluation window would be done by a nurse who would alert him if they noticed anything concerning. *See* Doc. 66-2 at 16, 80:1-11. He did not refer Mr. Padilla to a psychiatrist or otherwise seek more advanced follow-up care for him, and in fact specifically checked the "Not indicated" box on March 20th assessment form discharging Mr. Padilla from suicide watch and to general population. Doc. 94-3 at 4. To effectuate the release to general population, Mr. Abril checked the "Discharge from watch, follow up in accordance with policy or sooner as clinically indicated" box and the "Appropriate for General Population" box. *Id.*

Between March 20, 2020, and July 8, 2020, Mr. Padilla continued to feel depressed while living in the general population. Based on the low-level care plan that he had been given by Mr. Abril upon suicide watch discharge, apparently common to anyone receiving mental health medication, Mr. Padilla was only to be seen for follow-up visits every 60 to 90 days. Nonetheless, because he was part of the "morning med-pass," he was to be seen sooner if he ever felt that his medications were not working. During this time, his mental health care providers were Kim Devou, a psychiatric nurse practitioner based primarily at the Curry County Detention Center, and Mr. Abril. *See* Doc. 69-1 at 4-5, 15:2-16:9.

On July 8, 2020, Mr. Padilla notified staff that he felt that his medications were not working and sought medical attention due to increased depression. Doc. 66-5. He saw Mr. Abril for the third time two days later, on July 10, 2020. Doc. 91-4 at 2. Mr. Abril referred Mr. Padilla for a medication re-evaluation, which Nurse Devou conducted 12 days later, on July 22, 2020. *Id.*; Doc. 66-10 at 4. According to treatment records, she discontinued Mr. Padilla's prescription for 20 mg of Celexa and prescribed a six-week regimen of 20 mg of Prozac.[4] Doc. 66-10 at 4. On the

---

[4] In his July 10th Staff Referral form on behalf of Mr. Padilla, Mr. Abril listed 150 mg of Trazodone and 100 mg of Zoloft per day, even though there is no other record of him taking those medications. Doc. 91-5 at 5. There is an

Behavioral Health Psychiatric Provider Initial Evaluation that she completed following her visit with him, Nurse Devou incorrectly checked "No" for the "Prior Self Harm Attempt?" and "History of Substance Abuse?" boxes. Doc. 91-5 at 4. She diagnosed him with anxiety. *Id.* Six weeks later, on September 2, 2020, Nurse Devou saw Mr. Padilla for a follow-up and renewed his Prozac prescription for 90 days after he reported that it had been working better. Doc. 66-10 at 3; Doc. 83 at 4, ¶ 16. This was the last mental health care that he received before his death, including the last instance of medication management. Doc. 94 at 5, ¶ 11.

Mr. Padilla received medical treatment primarily from Jamie Bassell, a Certified Family Nurse Practitioner employed by Wellpath. Doc. 66-10 at 4-6. He was treated through the "chronic care clinic" as a result of a referral made during the intake screening. Doc. 66-11. For his diabetes mellitus and high blood pressure, Mr. Padilla was prescribed daily or twice daily blood glucose checks, daily blood pressure checks, a changing combination of dietary changes, antidiabetic medication, and high blood pressure medication.[5] *See* Doc. 66-10; Doc. 84-3. He also received care at the local hospital related to a laceration below his right eye incurred during a fight on April 18, 2020, and then returned to the emergency room on October 11, 2020, for an acute case of gastroenteritis. Doc. 66-10 at 2; Doc. 84-3 at 11, 37:4-13. He had been intermittently treated for gastrointestinal symptoms since May 1, 2020. Doc. 66-10 at 2-5. From the time that he was

asterisk next to Trazadone, but not Zoloft, which is marked in the margins as meaning "not taking per patient." *Id.* The form also states, "Says he is on Celexa since February 2020." *Id.* No other records corroborate the use of either medication; thus, the Court presumes that Mr. Padilla took only Celexa from February 2020 until Nurse Devou switched him to Prozac on July 22, 2020.

[5] Immediately following intake, Mr. Padilla was taking lisinopril for blood pressure management and glipizide for diabetes management. On March 21, 2020, Nurse Bassell further prescribed 30 days of hydrochlorothiazide, a diuretic commonly used to treat high blood pressure and edema. Doc. 66-10 at 6. Doc. 84-3 at 6, 32:1-5. Nurse Bassell renewed Mr. Padilla's prescription for those three medications for 60 more days on April 19, 2020. Doc. 66-10 at 5. Doses were adjusted at various points, and he began taking insulin on August 1, 2020. *Id.* at 4-5.

released to the general population until his death, he failed to appear for scheduled treatment, including receiving medication, approximately 55 times. Doc. 66-11.

On the evening of November 10, 2020, at around 10:17 p.m., Officer Jesus Lavalle and a Wellpath nurse, Beatrix Docherty, were handing out medications ("med-pass") when they overheard Mr. Padilla loudly and angrily having a telephone conversation with someone, later identified as his mother Sara Padilla, in Dayroom 5. Doc. 105-1 (transcript of first phone call to Mrs. Padilla); Doc. 83-4 at 6-7, 21:24-22:12. The transcript of their conversation reveals the source of the argument to have been a range of intra-family conflicts, namely, ongoing disagreements and perceived disrespect between Mr. Padilla and his father. Doc. 105-1. At one point, his mother stated that if this discord could not be resolved, "[he] need[ed] to go [his] own separate way." *Id.* at 2, 4:1-5:2. They also discussed Mr. Padilla's upcoming call the next morning with his attorney and how he should try to see a doctor, although they did not specify the medical concern. *Id.* at 2, 2:12-19. The call ended abruptly when Mr. Padilla said, "Whatever … I've got to go get my insulin." *Id.* at 5, 16:24-17:2. According to Officer Lavalle's testimony during his deposition, having heard this loud phone call and learned from another inmate that Mr. Padilla was speaking with his mother, he and Nurse Docherty asked Mr. Padilla if he was okay and whether he was having any issues.[6] Doc. 83-4 at 8, 23:7-14. He reported that Mr. Padilla responded, "It was just my mom." *Id.* Officer Lavalle further testified that it was "very usual" for Mr. Padilla to speak loudly and disrespectfully when on the phone. Doc. 66-3 at 2-3, 57:17-58:58 (Officer Lavalle stating that Mr. Padilla would get upset at least every other day). He also testified both that he was

[6] *C.f.* Material Fact #23 states that "Nurse Docherty and Officer Arica Sandoval spoke with Mr. Padilla and asked if he was okay, and all Mr. Padilla said was that it was just his Mom. Mr. Padilla took his medication and left back to the day room." Doc. 83 at 4, ¶ 23. Officer Sandoval also appears to have submitted a witness statement and/or incident report for this interaction, which, while not itself part of the record, was reviewed by Dr. Daniel. *See* Doc. 94-5 at 2-3. Thus, ambiguity persists concerning which officer, or perhaps both, was with Nurse Docherty during that interaction with Mr. Padilla.

not aware that Mr. Padilla was depressed and feeling hopeless, Doc. 83-4 at 15, 70:3-11, and that he had never heard Mr. Padilla threaten to hurt himself. *Id.* at 13, 58:8-10. He was trained to report mental breakdowns to medical, and testified that in the past similar outbursts from Mr. Padilla had prompted him to call a medical provider. Doc. 94-8 at 3-4, 58:20-59:3. This time, he explained, he did not do so because Nurse Docherty from medical was there with him. *Id.* at 5, 60:7-12.

RCDC Lieutenant Matthew Vigil was also on duty that night. Doc. 83-6 at 2, 10:17-20 (transcript of Lieutenant Vigil deposition). He was aware both that the med-pass was occurring and that Mr. Padilla was in a loud, heated argument on the phone, although he testified that he did not know what Mr. Padilla had said, other than that he was advised by other staff that Mr. Padilla had said it was a conversation with his mother. *Id.* at 2-3, 10:21-11:6. He did not listen to the phone call between Mr. Padilla and his mother until after the fact because staffing issues at the facility meant that he had to spend time stationed at booking.[7] Doc. 94-9 at 5, 13:10-14. Lieutenant Vigil recalled that Nurse Docherty had done that med-pass, but, as of the time of the deposition, could not recall that Officer Lavalle was the officer accompanying her. Doc. 83-6 at 3, 11:7-10. He testified that he remembered telling the officer who had done med-pass to keep an eye on Mr. Padilla throughout the night, but noted that he was aware that medical was already involved since this happened during med-pass. Doc. 94-9 at 4, 12:1-10. Justin Porter, the third named RCDC defendant, was the Administrator of the facility at the time of the incident. *See* Doc. 94-6 at 2, 4:16-22 (transcript of Administrator Porter deposition).

After receiving his medication, Mr. Padilla got back on the phone with his mother for a brief follow-up conversation. Doc. 105-2 (transcript of second call with Mrs. Padilla). The call

[7] Lieutenant Vigil testified that there would typically be five RCDC staff members, including himself, working during a fully-staffed shift, but that they were one person short on the night of November 10, 2020. Doc. 94-9 at 6, 14:5-25. Administrator Porter was not working during the shift when Mr. Padilla died, but also testified that he "believe[d] five [correctional staff] were on" during that shift. Doc. 94-6 at 14, 37:24-25.

began with a discussion of his intentions to find his own place and ultimately move to Kansas once he was released, but then devolved into an argument about who was always arguing with whom. *Id.* Mrs. Padilla told him that when he was released, he would need to find his own way home. *Id.* at 2-3, 2:11-6:17.

Mr. Padilla placed a third and final call that night, this time to Plaintiff Andrea Pankratz. Doc. 105-3 (transcript of call to Ms. Pankratz). Moving in with Ms. Pankratz, who lives in Kansas, appears to have been the plan that he had shared with his mother. *Id.* at 2, 2:17-3:10. However, as the transcript of their call reveals, Ms. Pankratz was unaware of this plan and had not yet given him permission to come live with her. *Id.* Mr. Padilla told her that if he could not stay with her in Kansas, then he might just take prison time rather than seek a probationary sentence. *Id.* He relayed the conflict with his mother and the fact that she was refusing to pick him up upon his release. *Id.* According to Mr. Padilla, his mother "ke[pt] fuckin' hanging up on me" and "sticking up for" his father rather than siding with him. *Id.* at 2, 2:24-5:8. Mr. Padilla made several concerning comments during this call, as follows: "I fuckin' hate it, man. I can't stand it no more," *id.* at 3, 6:8-9; "I got people that are just assholes and don't want to help me out and shit, and just – I'm done with life. I can't take it no more," *id.* at 3, 7:8-11; and "I'm just tired of it. I can't take it no more. I just want to … be able to get my disability and get the fuck out of Clayton and get the hell out of New Mexico and go back to Kansas." *Id.* at 3, 9:19-24. Ms. Pankratz reassured him as he vented, and over time he calmed down, told her that he appreciated her, and agreed to stay positive. *Id.* at 2-4, 4:17-10:24.

Following med-pass, RCDC staff performed welfare checks for Pod 5, which included Mr. Padilla's cell, Cell 29, at 10:31 p.m., 11:04 p.m., 11:26 p.m., and 11:53 p.m.[8] Doc. 83-7. Mr.

[8] These "welfare checks" were required to be done no less frequently than once every 30 minutes. Doc. 83-4 at 11, 50:7-9.

Padilla was alive and in his cell at these times, although a nearby detainee named Erasmo Eddie Vega III attested that the 11:53 p.m. round was "very short," and nobody spoke to any detainees. Doc. 94-7 at 2, ¶ 9. Officer Lavalle conducted the 11:53 p.m. check. Doc. 83-4 at 10-11, 49:6-50:1. There is no evidence in the record that he spoke to Mr. Padilla during that check, but Officer Lavalle testified that he looked into each cell with a flashlight and made visual contact with each inmate to confirm all were in their cells. *Id.* Although Administrator Porter affirmed that he had reviewed video of "somebody throwing a pair of socks out of Cell 29, and then retrieving them with a thread," Doc. 94-6 at 21, 60:10-14, there is neither evidence that Officer Lavalle saw the socks on the floor during the subsequent 11:53 p.m. round, Doc. 94-4 at 26, 62:6-8 (Dr. Daniel testifying that he did not know whether Officer Lavalle saw the socks on the ground), nor that he observed the socks being thrown. Doc. 83-3 at 11, 54:20-25 (Dr. Daniel's admitting, "I think I stand corrected," about his prior assertion that Officer Lavalle "saw Mr. Padilla throw the socks"). In his deposition, Lieutenant Vigil explained that it was not uncommon for inmates to throw their dirty laundry out of their cells as a way to get it washed. Doc. 94-9 at 7, 17:16-23. Pod 5 had two security cameras, but only one was working on the night of Mr. Padilla's death. Doc. 94-6 at 7, 16:19-23. The functioning camera did, however, capture Cell 29. Doc. 94-6 at 6, 15:11-12. Mr. Vega alleges that after this check, he could hear a loud kicking sound against the wall but noted that nobody came to investigate. Doc. 94-7 at 2, ¶ 9.

Mr. Padilla was found dead in his cell the next time Officer Lavalle walked through the area, at 12:24 a.m. on November 11, 2020. Doc. 18 at 6, ¶ 19. Mr. Padilla appears to have found a way to drag the socks into his cell using thread, and Officer Lavalle found him hanging by the socks, which had been tied to the double bunk. Doc. 83-5 at 6, 37:3-8; Doc. 18 at 6, ¶ 17; Doc. 94-6 at 21, 60:10-14. RCDC and Wellpath staff attempted CPR but were unsuccessful. Doc. 94-5 at

5. The Death Investigation summary by the University of New Mexico School of Medicine determined that Mr. Padilla died by suicide. Doc. 18 at 6, ¶ 21. A note found on his bedside table read, "Tell my daughter, I am sorry." *Id.*; Doc. 94-9 at 8, 21:4-7.

On the night of Mr. Padilla's death, there apparently were five correctional officers working at RCDC, which housed 130 inmates, for the 5:00 p.m. to 5:00 a.m. shift: Lieutenant Vigil, Officer Lavalle, Officer Sandoval, Officer Ross (first name unknown), and Officer Zandra Lozoya.[9] Doc. 83 at 4, ¶ 21; *c.f.* Doc. 94-9 at 6, 14:5-25 (Lieutenant Vigil testifying that there were supposed to be five correctional staff on shift, including him, but that there were only four, but without identifying individual officers). Another officer, Officer Vela (first name unknown), was sick and had to go home. Doc. 83 at 4, ¶ 21. Lieutenant Vigil testified that, in general, there were challenges recruiting correctional staff to work at the facility, and those who were retained worked overtime. Doc. 94-6 at 14, 37:18-25. Officer Lavalle worked 13.58 hours on November 7th and 16 hours on November 9th, and was scheduled for 13 hours on the night that Mr. Padilla died. *Id.* at 15-16, 39:18-40:10. He was slated for "time off before those days, and after those days." *Id.* at 16, 40:11-13. As a result of the one-staff shortfall during that shift, Lieutenant Vigil covered the booking desk for part of the time. Doc. 94-9, 5, 13:13-14.

It is undisputed that Officer Lavalle and Lieutenant Vigil each received suicide prevention training. Administrator Porter testified that "in the academy" officers "do an in-person training, and then there's an on-line refresher training we do periodically." Doc. 94-6 at 18, 47:17-24.

---

[9] County Defendants' Material Fact #21 states that besides Officer Lavalle, the "shift was also staffed by Officer Ross, Officer Vela, Officer Lozoya, and Sergeant Matthew Vigil. Officer Vela was feeling sick and had to go home." Doc. 83 at 4, ¶ 23. There is no mention of Officer Sandoval. *Id.* Yet, County Defendants' Material #23 states that "Nurse Docherty and Officer Arica Sandoval spoke with Mr. Padilla and asked if he was okay, and all Mr. Padilla said was that it was just his Mom. Mr. Padilla took his medication and left back to the day room." *Id.* at 4, ¶ 23. Plaintiffs did not object to any aspect of UMF #21 and did not object to that factual component of Material Fact #23. Doc. 94 at 7-8. Moreover, the Court continues to use Lieutenant Vigil rather than Sergeant Vigil, despite the latter being used in Material Fact #21, as it appears that he was serving in the lieutenant role during that shift. *See* Doc. 83 at 5, ¶ 28.

Officer Lavalle testified that he did a one- to two-hour suicide prevention training when he first started the job in December 2019, and then took another in March 2020. Doc. 83-4 at 2-3, 12:25-13:16. This training included audio-video classes, accompanying written materials, quizzes, and then a final test at the end. *Id.* It is likewise undisputed that Lieutenant Vigil "had received annual suicide prevention training, including in 2020." Doc. 83 at 5, ¶ 30; Doc. 94-6 at 14, 37:6-8.

With respect to medical staffing, the contract between RCDC and Wellpath covered 4.70 Full Time Equivalents (FTE), including nurses, physician assistants, clinical nurse practitioners, and nurse practitioners. Doc. 94-5 at 7. Of that medical staff capacity, six hours per week (0.15 FTE) was for a mid-level mental health nurse practitioner. *Id.* In addition, a mental health professional was on-call 24/7 to respond to calls at the facility. Doc. 94-6 at 19, 51:4-5. At that time, there were no specific standards set by the American Correctional Association or National Commission on Correctional Health Care for what constituted adequate mental health staff. Doc. 94-4 at 31, 68:6-11.

Based on these facts, Plaintiffs commenced the instant action on June 15, 2021, filing the initial Civil Complaint for Damages against County Defendants and Wellpath, LLC in New Mexico's Ninth Judicial District Court, Roosevelt County. *See* Doc. 4 at 12-36. County Defendants were served on June 21, 2021, and timely removed the case to federal court on July 16, 2021, based on the federal nature of the constitutional claims. Doc. 1; *see* 28 U.S.C §§ 1331, 1441, 1446(b). The Amended Complaint was filed on August 26, 2021, which, among other changes, added the three individual Wellpath Defendants: Nurse Skelton, Mr. April, and Nurse Bassell [Doc. 18]. County Defendants filed an Answer to the Amended Complaint on September 8, 2021 [Doc. 19]. Mr. Abril filed an Answer on September 9, 2021 [Doc. 20], and Nurse Skelton and Nurse Bassell filed an Answer on October 12, 2021 [Doc. 32].

On May 31, 2021, the Wellpath Defendants filed a Motion in Limine to Limit the Testimony of Dr. A.E. Daniel [Doc. 88]. That same day, County Defendants filed their Motion to Exclude, requesting the complete exclusion of Dr. Daniel's testimony. Doc. 89. Briefing proceeded as to the Motion to Limit, with Plaintiffs filing a Response on June 13, 2022 [Doc. 98] and the Wellpath Defendants filing a Reply on June 27, 2022 [Doc. 114]. However, Plaintiffs failed to Respond to County Defendants' Motion to Exclude. Wellpath LLC declared bankruptcy on November 11, 2024. As a result, on June 18, 2025, this Court dismissed Plaintiffs' claims without prejudice as to the Wellpath Defendants and found as moot all pending motions they had filed.[10] Doc. 123. On May 27, 2022, County Defendants filed the instant Motion for Summary Judgment. Doc. 83. County Defendants' Motion to Exclude Dr. Daniel's testimony and Motion for Summary Judgment remain before the Court and will be considered in turn.

## DISCUSSION

### I. County Defendants' Motion to Exclude Dr. Daniel's Expert Testimony

County Defendants urge the Court to exclude Dr. Daniel's testimony, arguing that his qualifications as a forensic psychiatrist and medical expert do not similarly qualify him as an expert on detention or corrections practices, and thus that he "should not be permitted to testify concerning the standards of care required of Detention Officers or Administrators." Doc. 89 at 2. They further argue that with respect to detention or corrections practices, and based on Rule 702 of the Federal Rules of Evidence, Dr. Daniel lacks "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would

[10] The Chapter 11 Plan that the U.S. Bankruptcy Judge approved on May 1, 2025, provided that any of the covered Debtors, including Wellpath LLC, as well as their employees and officers, would be discharged from liability for conduct from before the date of the bankruptcy filing (November 11, 2024) unless plaintiffs bringing those claims opted out of the third-party releases in the plan. Doc. 122 at 1-2. Plaintiffs did not opt out, which resulted in this Court's obligatory dismissal of their claims as to all the Wellpath Defendants. Doc. 123.

tend to aid the trier of fact in his search for truth." *Id.* at 3 (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)). County Defendants highlight that Dr. Daniel is a medical doctor specializing in psychiatry, that all of his opinions are offered within a reasonable degree of medical certainty, and that he "has never served in detention or correction setting, other than in the provision of medical care within that setting." Doc. 89 at 3. Accordingly, they argue, "notwithstanding his stated expertise in the provision of correctional healthcare," he "has no particular expertise or experience in the security practices of detention centers or prisons or as to the standard of care required of detention officers and administrators." *Id.*

Under Rule 702 of the Federal Rules of Evidence, witnesses with the requisite "knowledge, skill, experience, training, or education" may provide expert testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony has the burden of showing that it is admissible by a preponderance of the evidence. Fed. R. Evid. 104(a); *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n. 10 (1993); *United States v. Orr*, 692 F.3d 1079, 1091 (10th Cir. 2012); Rule 702 advisory committee's note (2000 Amendment).

In assessing the admissibility of a proposed expert's testimony, a trial court "generally must first determine whether the expert is qualified." *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012) (internal quotations and citations omitted). To be qualified, an expert need not be narrowly specialized in the pertinent topic at issue in the case, as "a lack of specialization does not affect the admissibility of the expert's opinion but only its weight." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991) (internal alterations and quotations omitted). "If

the expert is sufficiently qualified, then the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Avitia-Guillen*, 680 F.3d at 1256 (internal quotations omitted).

The Supreme Court in *Daubert* set forth a non-exclusive list of factors that a court may consider in determining reliability, including: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the theory is generally accepted in the relevant scientific community. 509 U.S. at 593-94; *see also Kumho Tire Co.*, 526 U.S. 137, 141 (1999) (extending *Daubert* from expert testimony based on scientific knowledge to testimony based on technical or other specialized language). The trial court need not apply all of these factors, *Avitia-Guillen*, 680 F.3d at 1258, and may consider additional relevant factors, *Kumho Tire*, 526 U.S. at 149-50. The Supreme Court has emphasized that the inquiry is meant to be a flexible one, focused on principles and methodology rather than the conclusions that are generated. *Daubert,* 509 U.S. at 595-96. The *Kumho Tire* Court reiterated that the test is flexible, 526 U.S. at 141, and held that a trial court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142. The factors enumerated in *Daubert* are not intended to be a "definitive checklist or test," *id.* at 150, but rather they should guide the trial judge in determining whether expert testimony is reliable. *Id*. at 150-52.

Crucially, reliability must be evaluated with respect to each particular opinion, and it is reversible error for a court to admit expert testimony on the basis of the expert's credentials and qualifications rather than opinion-specific reliability findings. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1227 (10th Cir. 2003) (*Dodge II*); *Fitzgerald v. Corrections Corp. of Am.*, 403 F.3d 1134,

1143 (10th Cir. 2005) (reversible error for the district court to rely on an expert witness' opinion for which the expert had "provided no basis for his conclusion that the care rendered … was appropriate or met or exceeded the accepted standards of care" (internal quotations omitted)). Nor can an expert's assurances alone substitute for an explained method, as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Dodge II*, 328 F.3d at 1227. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146; *see also Graves v. Mazda Motor Corp.*, 405 F. App'x 296, 299-300 (10th Cir. 2010) (unpublished) ("[T]he *ipse dixit* of an expert, no matter how qualified he may be, is never enough to guarantee him a ticket to admissibility."). Where an expert relies on personal experience rather than a testable technique, he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Rule 702 advisory committee's note (2000 Amendment)).

These principles were underscored by the 2023 amendment to Rule 702(d), which was enacted

> to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology. Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

Rule 702 advisory committee's note (2023 Amendment). Thus, each opinion that an expert proffers must be evaluated and gatekept on its own terms. The reliability of one opinion, or even

one sub-conclusion within an opinion, cannot carry an adjacent opinion or sub-conclusion that fails to satisfy the strictures of Rule 702 on its own merits. *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1200 n.12 (10th Cir. 2000) (*Dodge I*) (district courts must "vigilantly make detailed findings to fulfill the gatekeeper role crafted in *Daubert*" so as to ensure that each "particular opinion is based on valid reasoning and reliable methodology").

In addition to reliability, Rule 702 evidence must also be relevant to be admissible. *Daubert*, 509 U.S. at 589. Relevant evidence has "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. In the context of expert testimony, relevance means the testimony will "help the trier of fact to understand evidence or determine a fact in issue." Fed. R. Evid. 702(a). Subsection (a) thus requires an expert to do more than narrate what non-expert triers of fact can already understand with common sense. In *United States v. McDonald*, the Tenth Circuit determined that Rule 702 "dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." 933 F.2d 1519, 1522 (10th Cir.), *cert. denied*, 502 U.S. 897 (1997); *accord United States v. Muldrow*, 19 F.3d 1332, 1338 (10th Cir. 1994); *see also United States v. Michael*, No. 06-CR-1833, 2007 WL 9657855, at *3 (D.N.M. Nov. 15, 2007) (Armijo, J.) (quoting *United States v. Tapia-Ortiz*, 23 F.3d 738, 740 (2d Cir. 1994)) (expert witness provides testimony "beyond the ken of the average juror"). Even though jurors are presumed to be laypeople, they nevertheless "bring[] their own common sense and life experience to bear." *Thompson v. State Farm Fire & Cas. Co*, 34 F.3d 932, 939 (10th Cir. 1994). Where "expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally 'assist the trier of fact,'" and would thus amount to "a 'needless presentation.'" *Id.* at 941 (quoting Fed. R. Evid. 403).

On the other end of the spectrum, expert testimony may not cross the line into legal conclusions, as allowing as much would "supplant both the court's duty to set forth the law and the jury's ability to apply this law to the evidence." *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988 (*en banc*). Specifically, "testimony which articulates and applies the relevant law … circumvents the jury's decision-making function by telling it how to decide the case." *Id.* Similarly, such testimony can be excluded "on the ground that it usurps the function of the jury in deciding the facts, or interferes with the function of the judge in instructing the jury on the law." *United States v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005) (internal quotations omitted). Nonetheless, expert "testimony arguably embrac[ing] the ultimate issue" may still be permitted "as long as [it] assists, rather than supplants, the jury's judgment." *Id.* at 1172.

*Analysis*

Based on the foregoing standards, the Court finds that Dr. Daniel is a qualified expert in correctional psychiatry under Rule 702, with a particular emphasis on correctional suicide prevention. Dr. Daniel received his medical degree from the Medical College at the University of Kerala in India in 1966. Doc. 94-5 at 10. He completed a residency in psychiatry and neurology in India and then completed a residency in adult general psychiatry at the University of Missouri-Columbia in 1976. *Id.* He also completed a fellowship in child psychiatry at the same university in 1978. *Id.* He holds board certifications from the American Board of Psychiatry and Neurology, the American Board of Psychiatry in Child/Adolescent Psychiatry, and the American Board of Forensic Psychiatry. *Id.* He currently runs his own forensic psychiatry practice and Daniel Correctional Psychiatric Services, Inc. *Id.* at 11. He was the Director of Psychiatric Services for the Missouri Department of Corrections from December 2001 to June 2007. *Id.* He was also a psychiatric consultant to the Boone County jail. *Id.* at 12. He has numerous publications across

correctional and non-correctional psychiatric topics, including multiple on correctional suicide prevention.[11] *Id.* at 18-19. He authored a paper titled, "Preventing Suicide in Prison: A Collaborative Responsibility of Administrative, Custodial, and Clinical staff," that was published in 2006 by the Journal of the American Academy of Psychiatry and the Law, and he has published on ways that prisons and jails can better design their systems to improve mental health outcomes and reduce liability for lawsuits, such as this one. *Id.* at 18. He was one of the co-authors who updated the World Health Organization Resource Guide to Suicide in Jails and Prisons. *Id.* at 1, 18. Dr. Daniel explained that he considers himself to be an expert in correctional practices because of his extensive experience assisting correctional officers and detention facility administrators to design policies and procedures that meet the needs of detainees with psychiatric issues, including those at risk of suicide. Doc. 94-4 at 2-4, 11:4-13:14. He stated that he has specifically consulted with facilities regarding "suicide watch procedures, one-on-one supervision, how to identify mental health needs and mental health issues involving detainees and offenders." *Id.* at 4, 13:2-5.

As an expert witness retained by Plaintiffs, Dr. Daniel offered testimony during a deposition taken on April 1, 2022 [excerpt in Doc. 94-4], and produced an accompanying written report submitted in compliance with Federal Rule of Civil Procedure 26(a)(2)(B) [Doc. 94-5]. For his report, Dr. Daniel reviewed, *inter alia*, Mr. Padilla's medical records, reports from the detention officers, witness statements, the Wellpath manual of policies and procedures, and the National Commission on Correctional Health Care's 2015 report on Mental Health Services in Correctional Facilities. Doc. 94-5 at 2.

---

[11] For example, he authored in whole or part published papers with titles such as, "Suicide-Related Litigation in Jails and Prisons: Risk Management Strategies," "A Multidisciplinary Approach to Suicide Prevention in Jails and Prisons: The Best Defense Against Liability Lawsuits," "Care of the Mentally Ill in Prisons: Challenges and Solutions," "Serious Suicide Attempts in Correctional Systems and Preventive Strategies," and "Preventing Suicide and Jails and Prisons." Doc. 94-5 at 6-10.

Dr. Daniel thus has extensive experience providing and administering psychiatric care in prisons and jails; publishing research on related topics, including suicide prevention and cooperation between medical and custodial staff; and consulting with facilities on how they can design policies and procedures to address detainees' psychiatric needs. His standing in the field is reflected in his selection as one of the experts chosen to help update the World Health Organization's *Resource Guide to Suicide in Jails and Prisons*. Thus, while it is true that Dr. Daniel is a medical expert who has only ever worked on the provider and administrator side of correctional facilities, his expertise extends to the interface between medical providers and custodial staff – how components of a correctional facility work together to identify and manage suicide risk – and to the standards governing that interface. It is properly left to the trier of fact to determine whether Dr. Daniel's lack of specialized experience working as a detention officer should reduce the weight given to his admissible opinions compared to those within his area of core medical expertise. *See Werth*, 950 F.2d, at 648.

Furthermore, Dr. Daniel's theories and techniques have been tested on an ongoing basis, as his professional background combines practical day-to-day psychiatric work in correctional settings, during which approaches are tested, with academic work intellectually unifying those field-tested insights with conceptual frameworks and standards that can be shared with others, including at the very highest level of global public health. Relatedly, his theories have been subject to extensive peer review and publication, with his curriculum vitae listing 48 academic articles, one book, 35 papers presented, and two training courses developed. Doc. 94-5 at 15-22. This corpus of research reveals that there are standards establishing best practices in Dr. Daniel's field of expertise, and as already discussed, in some cases he has been involved as a subject-matter expert in setting those standards.

Finally, in connection with this case, Dr. Daniel relied on the ordinary methods of his discipline in reviewing all available medical, custodial, and screening records, as well as other available and pertinent materials. *See id.* at 2-3, 5-6.

However, admissibility is determined on an opinion-by-opinion basis, not an expert-by-expert basis, and not all of Dr. Daniel's opinions and the conclusions that he draws from them are supported by the kinds of thorough research, methodologies, and data that his discipline supplies. *See Dodge I*, 203 F.3d at 1200 n.12. Others are.

First, Dr. Daniel opined "with a reasonable degree of medical certainty" that "Eric Padilla was at suicide risk during his detention at Roosevelt County Jail beginning March 18, 2020." Doc. 94-5 at 6 (Opinion #1). He reached that conclusion by reviewing the available medical, intake, and custodial records and evaluating Mr. Padilla's documented history and presentation against the risk criteria recognized by his discipline, just as he would have done if he performed the assessment in clinical practice without having directly examined Mr. Padilla. Dr. Daniel's medical expertise is in correctional psychiatry and suicide prevention and, in identifying a detainee's serious psychiatric needs, he is opining within his core area of specialization. His opinion that Mr. Padilla was at suicide risk during his detention at RCDC beginning March 18, 2020, thus is admissible under Rule 702.

Second, Dr. Daniel opined that the "[i]nadequate welfare check by Officer Lavalle at 2353 hours on November 10, 2020, was a substantial deviation from the standard of care applicable to correctional officers." *Id.* at 7 (Opinion #12). He offered no further justification for that conclusion. His report and testimony fail to articulate the applicable standard of care, much less ground it in any national guideline, accreditation standard, or other authority. *See Fitzgerald*, 403 F.3d at 1143; *Medina-Copete*, 757 F.3d at 1104. The opinion is thus an *ipse dixit* conclusion and must be

excluded under Rule 702(d). *Graves*, 405 F. App'x at 299-300. This ruling is *not* based on Dr. Daniel's lack of custodial experience. He is thoroughly qualified to proffer an opinion on the standards governing how correctional staff interface with medical providers; had he identified the applicable standard and explained how his experience and/or other authorities support it, the opinion could have been admitted with its evidentiary weight left to the trier of fact. Lacking such support, however, his opinion concerning the adequacy of Officer Lavalle's security round at 11:53 p.m. must be excluded.

Third, Dr. Daniel opined that "the standard is about 1 FTE mid-level [mental health] provider" for a facility with "less than 200 inmates." Doc. 94-4 at 30, 67:8-20. In setting forth that opinion, however, he acknowledged that neither the American Correctional Association nor National Commission on Correctional Health Care, whose standards he heavily relied upon elsewhere, establish specific standards for the number of mental health staff in a facility of RCDC's size. *Id.* at 31, 68:6-19. Instead, he states that his opinion is derived "by practice" and based on being "very well aware of Wellpath's staffing in several different jails across the country." *Id.* at 30, 67:11-12. While an expert opinion can be reliable when "relying solely or primarily on experience … the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Rule 702 advisory committee's note (2000 Amendment). Dr. Daniel's testimony fails to explain how his practice connects to his opinion that 1 FTE would have been the adequate staffing level for mid-level mental health professionals, or what specifically he is familiar with concerning Wellpath's mental health staffing levels at other correctional facilities around the country. For this reason, his opinion on the sufficiency of staffing levels at RCDC is inadmissible under Rule 702(b).

Finally, Dr. Daniel concluded that "[b]oth the Roosevelt County Jail and Wellpath staff were aware of Mr. Padilla's serious medical need and they consciously disregarded it, resulting in his suicide." *Id.* at 9. That conclusion contains within it multiple sub-conclusions, each of which must be evaluated separately. *See*, *supra*, Rule 702 advisory committee's note (2023 amendment). As with Opinion #1, Dr. Daniel's sub-conclusion that Mr. Padilla had a serious medical need is admissible, as it is squarely within his core area of medical expertise to evaluate Mr. Padilla's history and presentation based on the records he reviewed.

However, Dr. Daniel's sub-conclusion that the RCDC and Wellpath staff were aware of Mr. Padilla's serious medical needs and consciously disregarded them must be excluded for three independently dispositive reasons. First, it is inadmissible under Rule 702(a) because the trier of fact does not need to go beyond "common sense and life experience" to evaluate whether the individuals involved possessed the requisite state of mind. *Thompson*, 34 F.3d at 939. Second, it is excludable under Rule 702(d), since the methodology that could give Dr. Daniel specific insight into those individuals' states of mind is never identified. Third, *Specht* requires exclusion of this sub-opinion, as Dr. Daniel's opinion that individual defendants acted with "deliberate indifference" and "consciously disregarded" Mr. Padilla's serious medical needs "circumvents the jury's decision-making function by telling it how to decide the case." 853 F.2d at 808. "Deliberate indifference" and "conscious disregard" are legal terms that the court would define for the jury by instruction so that they might decide whether the available evidence satisfies those terms' legal meaning. Admitting this sub-opinion would "supplant [rather than merely assist] both the court's duty to set forth the law and the jury's ability to apply this law to the evidence." *Id.* at 809.

Finally, Dr. Daniel's sub-conclusion that the staff's conduct "result[ed] in Mr. Padilla's suicide" cannot be admitted as written because the causation asserted runs through the now-

excluded predicate finding that they were aware of his needs and consciously disregarded them. Stated in terms of the medical care actually provided to address Mr. Padilla's psychiatric needs, however, Dr. Daniel would be within his core expertise to testify that this allegedly inadequate care contributed to Mr. Padilla's suicide. Such testimony would amount to no more than a causation-question within Dr. Daniel's core specialization and thus, so limited, is admissible.

Accordingly, Dr. Daniel's testimony is admissible to the extent that he opines that Mr. Padilla was at suicide risk during his detention at RCDC beginning March 18, 2020, that he had a serious medical need, and that the inadequacy of the medical care provided to Mr. Padilla to address that serious medical need contributed to his suicide.

## II. County Defendants' Motion for Summary Judgment

### A. Legal Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' and a fact is material when it 'might affect the outcome of the suit under the governing substantive law.'" *Ibarra v. Lee*, No. 22-5094, 2023 WL 6939236, at *2 (10th Cir. 2023) (quoting *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016)).

The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant meets this burden, the non-movant must come forward with specific facts, supported by admissible evidence, that demonstrate the existence of a genuine dispute. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n.11 (10th Cir. 1992). In deciding a motion for summary judgment,

the court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party." *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

Where, as here, Defendants invoke the doctrine of qualified immunity, the Court must determine whether there is a genuine dispute as to any material fact that could overcome qualified immunity and render summary judgment inappropriate. This distills to the question of whether Plaintiffs' factual allegations, supported by the record, are sufficient such that a reasonable jury could find that "the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Riggins v. Goodman,* 572 F.3d 1101, 1107 (10th Cir. 2009); *see also Cox v. Glanz,* 800 F.3d 1231, 1243 (10th Cir. 2015) (quoting *Thomas v. Salt Lake City,* 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J., concurring)) (where a defendant raises qualified immunity at the summary judgment stage, "the objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury" but to determine whether plaintiff's facts support a denial of qualified immunity) (emphasis in original).

Accordingly, "qualified immunity requires a two-step sequence." *Morris v. Noe,* 672 F.3d 1185, 1191 (10th Cir. 2012) (citation omitted). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citation omitted). "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity." *Gross v. Pirtle,* 245 F.3d 1151, 1156 (10th Cir. 2001). The court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lundstrom v. Romero,* 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)).

"A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right." *Lundstrom*, 616 F.3d at 1118-19 (citation omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Fisher v. City of Las Cruces*, 584 F.3d 888, 900 (10th Cir. 2009) (internal quotations omitted). A "plaintiff must show legal authority making it apparent that in light of pre-existing law a reasonable official would have known that the conduct in question violated the constitutional right at issue." *Id.* (internal quotations omitted).

This does not mean that the plaintiff must "present a case with an identical factual situation." *Id.* To the contrary, the Supreme Court has made clear that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.") (internal quotations omitted); *see also Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) ("The *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.") (internal quotations omitted). The "salient question" thus is whether the state of the law at the time of the alleged misconduct gave the defendant "fair warning" that their alleged misconduct was unconstitutional. *Hope*, 536 U.S. at 741. In order to answer this question, the court looks to "Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains." *Lundstrom*, 616 F.3d at 1119.

**B. Analysis**

1. Fourteenth Amendment Claims against the Individual Defendants

In Count I, Plaintiffs assert that Officer Lavalle, Lieutenant Vigil, and Administrator Porter ("Individual Defendants") violated Mr. Padilla's "substantive due process right under the Fourteenth Amendment to humane conditions of confinement and adequate medical care." Doc. 18 at 17-18, 25-27. Plaintiffs thus appear to base their Fourteenth Amendment claims on both the Individual Defendants' deliberate indifference to a serious medical need and the conditions of his confinement at RCDC. Doc. 18 at ¶¶ 66-67.[12]

*Legal Standard*

"Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Barrie v. Grand County, Utah,* 119 F.3d 862, 868 (10th Cir. 1997); *see also Blackmon v. Sutton,* 734 F.3d 1237, 1244 (10th Cir. 2013) ("[D]etention officials surely owe pretrial detainees … at least the same standard of care prison officials owe convicted inmates."). Medical care includes psychological or psychiatric care. *See Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996). Accordingly, Plaintiffs' due process claims must be assessed under the "deliberate indifference" standard developed in the Eighth Amendment context. *Blackmon,* 734 F.3d at 1244; *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1315 (10th Cir. 2002) ("Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases

[12] Plaintiffs' Reply to the County Defendants' Motion for Summary Judgment only advances the theory of deliberate indifference to Mr. Padilla's serious medical needs and does not address anything concerning conditions of confinement. Nevertheless, the Court does not deem the latter theory abandoned, especially since, as laid out, *infra*, the operative constitutional standard for deliberate indifference from *Farmer v. Brennan*, 511 U.S. 825 (1994), which includes the dispositive subject prong, applies to both.

brought pursuant to § 1983.") (internal quotations omitted); *see also Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020), *cert. denied*, 142 S. Ct. 312 (2021); (explaining that the same deliberate indifference standard applies no matter which amendment provides the constitutional basis for the claim); *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (the deliberate indifference standard governs a pretrial detainee's conditions-of-confinement claims, which arise under the Due Process Clause but for which "the Eighth Amendment standard provides the benchmark").

Specifically, in *Estelle v. Gamble*, the Supreme Court held that "[a] prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Mata*, 427 F.3d at 751 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain … proscribed by the Eighth Amendment.") (internal quotations and alterations omitted)). Such deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05. Accordingly, the deliberate indifference standard applies "not only [to] medical professionals who fail to treat, but also [to] prison officials who assume gate keeping authority over prisoner access to medical professionals." *Blackmon*, 734 F.3d at 1245 (internal quotations omitted). Specifically, a prison official may be liable for "prevent[ing] an inmate from receiving treatment or deny[ing] him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

Under the *Estelle* deliberate indifference standard, the test for constitutional liability of prison officials "involves both an objective and a subjective component." *Mata*, 427 F.3d at 751

(quoting *Sealock*, 218 F.3d at 1209. First, a plaintiff must show "objective evidence that the deprivation at issue was in fact 'sufficiently serious,'" *id.* (internal quotations omitted), "to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209 (citation omitted). If a plaintiff's claim is based on a delay in medical care, the plaintiff also must show that "the delay resulted in substantial harm." *Mata*, 427 F.3d at 751 (citation omitted). "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (internal quotations omitted). Framed as a condition of confinement claim, the objective component asks whether the deprivation denied "the minimal civilized measure of life's necessities," or whether the detainee was "incarcerated under conditions posting a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Death by suicide is a sufficiently serious harm and satisfies the objective component of both an inadequate medical care claim and a conditions of confinement claim. *Gaston v. Ploeger,* 229 F. App'x 702, 710 (10th Cir. 2017) ("Obviously, suicide satisfies [the objective] requirement.").

Having met the objective prong, the plaintiff next must meet the subjective prong of the deliberate indifference test. *Mata,* 427 F.3d at 751-52. The subjective prong is the same whether the claim is framed as one of inadequate medical care or unconstitutional conditions of confinement. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (finding "no significant distinction between claims alleging inadequate medical care and those alleging inadequate conditions of confinement," as "the medical care a prisoner receives is just as much a condition of his

confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates") (internal quotations omitted).

"[T]o meet the subjective prong, [the plaintiff is required] to provide evidence supporting an inference that defendants knew about and disregarded a substantial risk of harm to her health and safety." *Mata*, 427 F.3d at 752. As to the defendant's knowledge of a substantial risk of harm, "[a] jury is allowed to infer that a jail official had actual knowledge of the substantial risk of serious harm based only on circumstantial evidence." *Estate of Burgaz v. Board of Cty. Commr's for Jefferson Cty., Colo.,* 30 F.4th 1181, 1186 (10th Cir. 2022). Such an inference is possible where the risk is "obvious, so that a reasonable [person] would realize it." *Id.* (quoting *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001)). Relevant here, however, the Tenth Circuit has advised that "a substantial risk of suicide may be impossible to discern unless the particular inmate reveals indicia of that risk to prison officials." *George v. Beaver Cty.*, 32 F.4th 1246, 1257 (10th Cir. 2022).

A defendant's knowledge of a substantial risk of harm is necessary but not sufficient to establish liability. Rather, to be found liable, the officer must also "disregard[] an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 837, "by failing to take reasonable measures to abate it." *Kikumura v. Osagie,* 461 F.3d 1269, 1293 (10th Cir. 2006), *overruled on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). To establish the requisite level of disregard, a plaintiff must show that the official acted with "a higher degree of fault than negligence, or even gross negligence." *Barrie,* 119 F.3d at 869 (quoting *Berry v. City of Muskogee,* 900 F.2d 1489, 1495-96 (10th Cir. 1990)). Accordingly, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 844. Relatedly, "an officer's

failure to adhere to administrative regulations does not equate to a constitutional violation." *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993). "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194 (1984).

Relevant here, a prisoner may satisfy the subjective component of the deliberate indifference test by showing that a gate keeping prison official denied or delayed him access to medical care in conscious disregard of a substantial risk of serious harm. *Sealock*, 218 F.3d at 1211; *Mata*, 427 F.3d at 1211; *Lucas*, 58 F.4th at 1137. The Tenth Circuit has held that this gatekeeping obligation is fulfilled "by communicating the inmate's symptoms to a higher-up." *Burke v. Regalado*, 935 F.3d 960, 993 (10th Cir. 2019).

The Tenth Circuit applied this principle in *Crowson v. Washington Cty. Utah*, 983 F.3d 1166 (10th Cir. 2020). There, several days after Mr. Crowson had been booked into a correctional facility, Nurse Johnson checked on him. *Id.* at 1174. "As a registered nurse, Nurse Johnson could not formally diagnose and treat Mr. Crowson," but rather was tasked with "assess[ing] inmates and communicat[]ing with medical staff." *Id.* "If an inmate exhibited symptoms of a cognitive problem," Nurse Johnson would inform the medical staff available at the facility, namely, either Physician Assistant (PA) Worlton or Dr. LaRowe, the jail's physician. *Id.* at 1175. When Nurse Johnson evaluated Mr. Crowson, he was "dazed and confused and unable to remember what kind of work he did prior to being arrested." *Id.* Because he was "concerned that Mr. Crowson m[ight] be suffering from some medical problem," Nurse Johnson "ordered Mr. Crowson moved to a medical observation cell following the examination" and "entered a request in the medical recordkeeping system for PA Worlton to conduct a psychological evaluation." *Id.* Nurse Johson left the jail at the end of his shift that day without conducting further assessments of Mr. Crowson

or contacting Dr. LaRowe. *Id.* PA Worlton never received Nurse Johnson's file notation requesting a psychological examination of Mr. Crowson. *Id.*

In addressing Mr. Crowson's claim that Nurse Johnson violated his constitutional rights, the Court explained that Nurse Johnson's role was "solely to serve as a gatekeeper for other medical personnel capable of treat[ment]," and thus he could be liable for deliberate indifference from denying access to medical care." *Id.* at 1179. The Court found that Nurse Johnson "knew Mr. Crowson had potentially alarming symptoms and suspected there was a medical issue," which knowledge "was sufficient to trigger [his] duty as a gatekeeper to provide Mr. Crowson access to medical personnel who could provide care." *Id.* at 1180. The Court further found that, "[i]n his gatekeeping role, Nurse Johnson was required to inform medical staff who could diagnose and treat a pretrial detainee exhibiting concerning symptoms." *Id.* The Court concluded that Nurse Johnson sufficiently "attempted to do so by requesting a psychological evaluation of Mr. Crowson, making notations in Mr. Crowson's file, and having discussions with PA Worlton about Mr. Crowson's condition." *Id.* In reaching its conclusion, the Court noted that while "Nurse Johnson could have done more," such as ensuring that the referral reached PA Worlton, communicating the severity of Mr. Crowson's condition, or contacting Dr. LaRowe immediately, Nurse Johnson nonetheless did not deny Mr. Crowson "access to medical personnel capable of evaluating the need for treatment." *Id.* (quoting *Sealock*, 218 F.3d at 1211). And because Nurse Johnson 'did not completely refuse to fulfill his duty as gatekeeper," instead referring Mr. Crowson "to a physician assistant for medical treatment," Nurse Johnson "was not deliberately indifferent to his gatekeeper role." *Id.* (quoting *Mata,* 427 F.3d at 758). While "Nurse Johnson's attempted method of referral may have been negligent, [] it was not deliberately indifferent." *Id.*

*Analysis*

Applying this precedent to the facts here, the Court finds that none of the Individual Defendants violated Mr. Padilla's Fourteenth Amendment rights.[13] To prove a constitutional violation capable of overcoming qualified immunity, Plaintiffs must establish that both the objective and subjective components of the *Estelle* deliberate indifference are met as to each Individual Defendant. *See Pahls v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013). The Court assumes that the objective component is satisfied as to each Individual Defendant, since the Tenth Circuit has squarely held that death by suicide constitutes serious harm. *Gaston*, 229 F. App'x at 709. As to the subjective component, however, while the Individual Defendants indeed held a gatekeeper role in ensuring medical access to Mr. Padilla, viewing the facts in the light most favorable to Plaintiffs, the Court cannot find that any of the Individual Defendants were deliberately indifferent to that gatekeeper role.

<u>Officer Lavalle</u>

In support of their claim that Officer Lavalle consciously disregarded Mr. Padilla's substantial risk of suicide in violation of his constitutional rights, Plaintiffs argue that Officer Lavalle "knew that Mr. Padilla was having a mental breakdown almost every other day between March 18[], and November 11[], 2020" and "should have attempted to de-stress Mr. Padilla" when he became "aware that Mr. Padilla was having a mental breakdown on November 10th, 2020." Doc. 94 at 18. They further argue that the "welfare check by [Officer] Lavalle was a substantial deviation from the standard of care applicable to correctional officers and in violation of national standards" because he "saw the socks being thrown from the cell" but did "not stop and talk with

[13] As discussed above, in order to overcome qualified immunity, Plaintiffs must establish both that the Individual Defendants violated Mr. Padilla's Fourteenth Amendment rights, and that those rights were clearly established at the time of the violation. As set forth herein, the Court finds that Plaintiffs have failed to establish a constitutional violation by any of the Individual Defendants; qualified immunity must be granted on that basis alone. Of course, it stands to reason that the lack of a constitutional violation necessarily means that the clearly established law did not put the Individual Defendants on notice that their conduct was unconstitutional.

Mr. Padilla, his security round at or around 11:53 p.m. was "very short and did not include speaking to anyone including Mr. Padilla or determining whether anybody was in distress," and he did not respond to the sounds of "Mr. Padilla's feet kicking against the wall of his cell before he was found dead." *Id.* In setting forth these arguments, Plaintiffs rely heavily on Dr. Daniel's expert opinion. While Dr. Daniel does not dispute that Officer Lavalle followed what he was trained to do during the phone call encounter, he nevertheless concludes that Officer Lavalle breached the standard of care applicable to correctional officers in two ways,[14] namely, by failing to "deescalate or de-stress" Mr. Padilla when he and Nurse Docherty witnessed Mr. Padilla's angry phone call with his mother*, id.* at 37-38, 76:12-77:8, and by failing to "stop and talk to" Mr. Padilla, *id.* at 26, 62:9-23, when he allegedly "saw that Mr. Padilla threw a pair of socks out the window" into the hallway of the pod during the 11:53 p.m. security round. Doc. 94-5 at 5. Viewing the facts in the light most favorable to Plaintiffs, the Court finds that neither Dr. Daniel's conclusions nor Plaintiffs' assertions are supported by the record.

First, the fact that Officer Lavalle knew that Mr. Padilla was having a "mental breakdown" during his telephone call with his mother is not the equivalent of establishing that Officer Lavalle knew of Mr. Padilla's risk of suicide. To be sure, Officer Lavalle reported to his supervisor and the nurse on shift, and then consistently testified in his deposition, that Mr. Padilla had been having a "mental breakdown" when he heard and observed Mr. Padilla angrily talking on the phone. Doc. 94-8 at 3-4, 58:20-59:3. Officer Lavalle, however, also testified that this kind of episode in which Mr. Padilla got "upset" was "very usual," to the extent that he estimated it happened at least every other day. *Id.* at 2-3, 57:25-58:7. While Dr. Daniel testified that "emotional meltdowns, you know,

[14] These are the only alleged breaches of care that, in Dr. Daniel's opinion, rise to the level of conscious disregard on the part of Officer Lavalle or any other detention officer. Indeed, the majority of his testimony focuses on the acts and omissions of the Wellpath staff, including Dr. Abril and Nurse Skelton, rather than on the failures of correctional personnel. Doc. 94-4 at 37-38, 76:9-77:16.

talking very exasperatingly," are valuable indicators of potential suicide risk because they represent "behavioral changes," Doc. 94-4 at 8, 27:12-24, it is undisputed that Mr. Padilla got upset in a similar manner at least every other day; accordingly, the behavior he exhibited during the call with his mother did not represent such a "behavioral change."[15] Given the regularity of these "breakdowns," Officer Lavalle credibly did not find Mr. Padilla's behavior during the call with his mother to be an indicator of Mr. Padilla's potential suicide risk. *Id.* at 2, 57:20-25. Indeed, Officer Lavalle clarified that he understood these breakdowns to "just be angry" episodes where Mr. Padilla would raise his voice to "whoever was on the phone with him," and did not recall witnessing Mr. Padilla crying during these episodes. *Id.* at 4, 59:9-15.[16]

Accordingly, while the record demonstrates that Officer Lavalle was aware that Mr. Padilla had been exhibiting "angry episodes" for the past eight months, it does not equally establish that, based on these episodes, Officer Lavalle believed that Mr. Padilla had a serious medical need related to his risk of suicide. In fact, nowhere do Plaintiffs assert that Officer Lavalle was subjectively aware of that particular risk, nor do they dispute his testimony, incorporated into Material Fact #26, that he had never been informed about Mr. Padilla's depression or feelings of hopelessness. Doc. 83 at 5, ¶ 26. It is likewise undisputed that Officer Lavalle never heard Mr. Padilla threaten to kill himself. *Id.* at 5, ¶ 27. Nor does Dr. Daniel's report conclude that Officer Lavalle, or indeed any correctional defendant, knew or should have known of that risk based on the behavior that Mr. Padilla exhibited. Doc. 94-5 at 6.

---

[15] Indeed, there is no evidence that either Mrs. Padilla or Ms. Pankratz was specifically worried about his suicidality that night. Although a circumstantial consideration, it is reasonable to expect that if they were worried that he was in acute danger, they would have probed further during their respective calls, or perhaps would have alerted RCDC staff about what they had heard. Neither occurred.

[16] Notably, Nurse Docherty, a medical professional, did not herself conclude that Mr. Padilla posed a specific risk of suicide based on the argument with his mother. Doc. 104 at 6.

Even if Mr. Padilla's behavior had put Officer Lavalle on notice of his risk of suicide, the undisputed facts do not allow for the conclusion that Officer Lavalle consciously disregarded that risk by failing to "deescalate or de-stress" Mr. Padilla. As Officer Lavalle testified, he was trained to "call a medical provider" whenever "a detainee was having a mental breakdown such as the one on November 10th." *Id.* at 5, 60:2-6. While he did not, in fact, "call a medical provider on the 10th," he explained this decision by noting that he was *with* a medical provider, namely, Nurse Docherty, at the time he witnessed Mr. Padilla's "breakdown." *Id.* at 5, 60:7-12. The presence of Nurse Docherty necessarily obviated his obligation to summon a medical provider, as Nurse Docherty, herself a medical provider, observed Mr. Padilla's symptoms simultaneously with Officer Lavalle's own observations.

Indeed, Dr. Daniel conceded during his deposition that with both a detention officer and medical provider present, the more appropriate person to administer care in the form of "de-stressing and deescalating" Mr. Padilla was the medical provider, as it is she who bore "primary responsibility." Doc. 94-4 at 27, 63:21-64:21. Administrator Porter testified similarly that correctional staff are not "designated to initiate suicide precautions," but rather, "if we believe someone may be in crisis, we refer them to medical." Doc. 94-6 at 18-19, 50:8-51:18. Administrator Porter explained that, in terms of suicide prevention, detention officers "see people that are struggling, and try and get them to resources." *Id.* at 18, 47:15-16. In the face of this evidence, Plaintiffs have provided no basis from which to conclude that Officer Lavalle was required to do anything other than ensure that a medical provider was called to the scene, a requirement which, as previously noted, was obviated by Nurse Docherty's presence.

Controlling precedent makes clear that Officer Lavalle's role was "solely to serve as a gatekeeper for [] medical personnel capable of treatment." *Crowson*, 983 F.3d at 1179. In that role,

he was "required to inform medical staff who could diagnose and treat" Mr. Padilla. *Id.* at 1180. Here, Officer Lavalle did not "refuse to fulfill his duty as gatekeeper," as, under the circumstances, he needed to take no action to ensure that medical staff was informed of Mr. Padilla's exhibition of "concerning symptoms." *Id.* (internal alterations omitted).

Further, the undisputed facts establish that, after Officer Lavalle and Nurse Docherty witnessed Mr. Padilla angrily speaking on the phone, a medical provider evaluated Mr. Padilla's need for treatment. *See id.* at 1180. Specifically, Nurse Docherty, accompanied by one or both of Officers Lavalle and Sandoval, spoke with Mr. Padilla to ensure his well-being and administered his medications. The record demonstrates that in response to her inquiries, Mr. Padilla reported that he was okay and that it had just been his mother on the phone. He willingly took his medication when Nurse Docherty administered it to him. Nurse Docherty's attention to Mr. Padilla subsequent to Officer Lavalle's observation of his "breakdown" establishes that, as a matter of law, Officer Lavalle neither delayed nor denied Mr. Padilla "meaningful access to care … in conscious disregard of a substantial risk of harm." *Blackmon*, 734 at 1245. [17] Whether the care that followed was constitutionally adequate does not inform the inquiry as to whether Officer Lavalle was deliberately indifferent. Accordingly, no reasonable fact-finder could conclude that Officer Lavalle's failure to take active steps to de-escalate and de-stress Mr. Padilla constitutes deliberate indifference to a substantial risk of harm in violation of the Fourteenth Amendment.

[17] While the record demonstrates that it was during his last phone call with Ms. Pankratz that Mr. Padilla made his most troubling comments about not being able to stand it anymore and not wanting to live anymore, Plaintiffs attach to their response brief an affidavit from a nearby inmate, Mr. Vega, in which he attributes those latter comments to the initial phone call to Mr. Padilla's mother that was witnessed by Officer Lavalle. Notably, Plaintiffs never assert as fact that either Officer Lavalle or Nurse Docherty heard those comments, instead more nebulously stating that the conversation including those comments "could be distinctly heard by everybody in the POD." Doc. 94 at 8, ¶ 15(iii). Even if Officer Lavalle had heard those particular comments, there would still be no basis for finding that he failed to fulfill his gatekeeping role by denying or delaying Mr. Padilla's access to a medical professional.

Nor would the undisputed facts allow a reasonable trier of fact to conclude, as Plaintiffs argue, that Officer Lavalle acted with deliberate indifference during his 11:53 p.m. security/welfare round. Plaintiffs argue that Officer Lavalle acted with deliberate indifference because he saw Mr. Padilla throw socks from his cell into the common area, but then failed to "stop and talk to" Mr. Padilla, Doc. 94 at 18, during what Plaintiffs characterize as a "superficial walk-through" of Day Room 5. Doc. 18 at 6, ¶ 18. These contentions fail, however, on both legal and factual grounds.

Even assuming *arguendo* that the facts as alleged could be proven, Plaintiffs have failed to establish how seeing Mr. Padilla throw socks *out* of his cell should have put Officer Lavalle on notice that Mr. Padilla posed a suicide risk. To the contrary, Plaintiffs never dispute Lieutenant Vigil's testimony that at RCDC it was not uncommon for detainees to throw dirty laundry out of their cells as a way to get it washed. In other words, not only is there no reason that Officer Lavalle should have viewed socks thrown into the Day Room 5 as concerning, but there is an undisputed reason why he would not have done so. Thus, setting aside Dr. Daniel's admission that he actually did not know whether Officer Lavalle saw Mr. Padilla, or anyone else, throw the socks, there is nothing from which a reasonable trier of fact could conclude that seeing the socks should have alerted Officer Lavalle to Mr. Padilla's serious medical need, much less that he had actual knowledge of that need and acted with deliberate indifference towards it. *Mata*, 427 F.3d at 751. Moreover, no facts supported by evidence undermine Officer Lavalle's undisputed testimony that he made visual contact with each detainee during that round, including Mr. Padilla, by shining a light into each cell, as he was required to do. [18] Doc. 83-4 at 10, 49:6-24. After the round was

[18] Mr. Padilla's inmate-neighbor Mr. Vega's affidavit includes assertions that Officer Lavalle's security round was short and did not include follow-up with Mr. Padilla concerning the socks. Doc. 94-7 at 2. This does not undermine the foregoing analysis, as a short round that included the required visible check into the cells is nowhere claimed to be deficient, and there would have been no reason for Officer Lavalle to talk to Mr. Padilla about the socks given

complete, he noted that all the detainees, including Mr. Padilla, were in their cells. *Id.* at 10-11, 49:6-50:1.

Accordingly, there are no facts in the record concerning Officer Lavalle's 11:53 p.m. security/welfare round that demonstrate his refusal to fulfill his duty as gatekeeper by denying or delaying Mr. Padilla access to medical personnel capable of evaluating the need for treatment. *See Crowson*, 983 F.3d at 1180. It follows that no reasonable fact-finder could conclude that Officer Lavalle's conduct during that round constitutes deliberate indifference to a substantial risk of harm in violation of the Fourteenth Amendment.

Lieutenant Vigil

In support of their claim that Lieutenant Vigil consciously disregarded Mr. Padilla's substantial risk of suicide in violation of his constitutional rights, Plaintiffs argue that a "referral to a mental health professional should have been made" since "suicide prevention was part of [Lieutenant] Vigil's job duties." Doc. 94 at 19. However, as with Officer Lavalle, Lieutenant Vigil's role was that of a gatekeeper. As such, his constitutional obligation was to ensure Mr. Padilla's "access to medical personnel who could provide care." *Crowson*, 983 F.3d at 1180. The undisputed facts do not allow the conclusion that Lieutenant Vigil failed to meet this obligation.

It is undisputed that Lieutenant Vigil was advised of Mr. Padilla's behavior during his telephone call with his mother, and also was advised that during that call, both an officer and "medical," namely, Nurse Docherty, were present. Lieutenant Vigil testified that he was aware that, after the call, "[t]he officer at that moment was already speaking to medical." Doc. 94-9 at 4,

---

that there is no evidence that, if Mr. Padilla did throw the socks, Officer Lavalle knew he had done so. Mr. Vega also states that he "could hear Eric Padilla's feet kicking against the wall before he was found dead," but "nobody responded to the loud kicking on the wall." *Id.* Although undisputed, this fact does not affect the Court's analysis since that occurred between security rounds, and neither Plaintiffs nor Mr. Vega assert that Officer Lavalle or any other staff member heard that kicking but failed to respond.

12:4-5. He explained that the presence of "medical" was consistent with their protocol, noting: "one of the things that we had to practice in the facility was if there was any detainee that was acting a little bit abnormal outside of their usual, we would go ahead and refer them over to medical so medical can either speak with them, or refer them over to mental health." *Id.* at 4, 12:5-10. In addition to being assured that "medical" was involved, Lieutenant Vigil directed "the officer [to] check on him at the moment" and to maintain visual checks on Mr. Padilla throughout the night. *Id.* at 4, 12:1-3. In accordance with his directions, the evidence demonstrates that Nurse Docherty, joined by one or both of Officers Sandoval and Lavalle, checked on Mr. Padilla after the telephone call, and that Officer Lavalle made visual contact with Mr. Padilla during his later security round.

Accordingly, even assuming that Lieutenant Vigil was put on notice, by his officers' recounting of Mr. Padilla's behavior, of Mr. Padilla's risk of suicide, the undisputed facts do not allow for the conclusion that Lieutenant Vigil consciously disregarded that risk. Lieutenant Vigil received assurances that Mr. Padilla was given access to "medical," and further gave directives to ensure that his officers fulfilled their gatekeeper role, namely, by monitoring Mr. Padilla through the night. Indeed, the record is devoid of evidence that Lieutenant Vigil either delayed or denied Mr. Padilla "meaningful access to care . . . in conscious disregard of a substantial risk of harm." *Blackmon*, 734 at 1245. It follows that no reasonable fact-finder could conclude that Lieutenant Vigil's conduct constitutes deliberate indifference to a substantial risk of harm in violation of the Fourteenth Amendment.

<u>Administrator Porter</u>

Plaintiffs allege supervisory liability against Administrator Porter, who was in charge of RCDC during the entirety of the pertinent period. Section 1983 liability extends to supervisory detention officials when there is an "'affirmative link' between a supervisor and the alleged

constitutional injury." *Cox*, 800 F.3d, at 1248 (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)). To establish an affirmative link, plaintiffs must satisfy "three related prongs: (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Id.* Liability based purely on a theory of respondeat superior is not available. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). As the Tenth Circuit has explained, its case law "continue[s] to require plaintiffs to demonstrate 'that each defendant acted with the constitutionally requisite state of mind' by 'identifying … specific policies over which particular defendants possessed supervisory responsibility that violated their clearly established constitutional rights.'" *Cox*, 800 F.3d at 1249 (quoting *Pahls*, 718 F.3d at 1226). This standard requires a "state of mind [that] can be no less than the *mens rea* required of any of [the supervisor's] subordinates." *Cox*, 800 F.3d, at 1249 (internal quotations omitted). Thus, where the underlying constitutional deprivation involves the conscious disregard of an inmate's risk of suicide, plaintiffs must prove as to the supervisory prison official "a *particularized* state of mind: actual knowledge . . . of an individual inmate's substantial risk of suicide." *Id.* (emphasis in original).

Plaintiffs recognize, but do not meet, their burden to prove that Administrator Porter had "actual knowledge" of Mr. Padilla's "substantial risk of suicide." Doc. 94 at 18 (quoting *Cox*, 800 F.3d at 1249). No facts supported by evidence, or even alleged, would allow a reasonable trier of fact to find that Administrator possessed this "*particularized* state of mind." *Cox*, 800 F.3d at 1249 (emphasis in original). Instead, Plaintiffs assert several alleged inadequacies of the facility overseen by Administrator Porter, including the malfunctioning of one of the two cameras with a view of Mr. Padilla's cell and an unspecified failure to "remediate the situation" involving "national standards regarding medical and mental health care of inmates." Doc. 94 at 18. Plaintiffs generally allege that unidentified "Detention Center staff" were "aware of Mr. Padilla's serious

medical need but consciously disregarded it, resulting in his suicide," and that RCDC "did not have an adequate suicide prevention policy," which amounted "to a custom, policy and practice which resulted in the death of Mr. Padilla." *Id.* at 18-19. None of these assertions indicate that Administrator Porter personally knew about Mr. Padilla's particularized risk of suicide and ignored it. Thus, while these arguments may be relevant to Plaintiffs' municipal liability claim against the County, without establishing the requisite *mens rea* as to Administrator Porter, Plaintiffs' Fourteenth Amendment claims against him must fail.[19]

2. Municipal Liability Claims Against the County

In Count III-i, Plaintiffs allege that the "policies, customs, decisions and practices of Defendants have created a climate within the [RCDC] whereby the mentally ill are deprived of adequate medical care and humane conditions of incarceration." Doc. 18 ¶ 93. According to Plaintiffs, "[t]here is a causal connection between Defendants['] policies and the violation of Mr. Padilla's constitutional rights, which amounts to deliberate indifference." *Id.* ¶ 94. On this basis, Plaintiffs seek to hold the County liable under § 1983.

A *Monell* claim allows plaintiffs to "sue local governing bodies . . . directly under § 1983 for constitutional violations pursuant to a body's policy, practice, or custom." *Burgaz*, 30 F.4th at 1189. To establish *Monell* liability, plaintiffs must show: "(1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020).

"Because municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Crowson*, 983 F.3d at 1191.

[19] Indeed, this would be so even if Officer Lavalle and/or Lieutenant Vigil were found constitutionally liable, as that liability would not extend to Administrator Porter simply because of his supervisory responsibilities over RCDC.

Accordingly, "[t]he general rule . . . is that there must be a constitutional violation, not just an unconstitutional policy, for a municipality to be held liable." *Id.* at 1191. "In most cases, this makes the question of whether a municipality is liable dependent on whether a specific municipal officer violated an individual's constitutional rights." *Id.* This is categorically so in "failure-to-train" cases: "a city may not be held liable for failure to train when there has been no underlying constitutional violation by one of its employees." *Id.* at 1187 (citations omitted).

There is, however, a "limited exception" to this rule in the Tenth Circuit. *Id.* at 1191. "[W]hile unusual, municipal liability may exist without individual liability: for example, for a systemic failure of medical policies and procedures." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023). Where the allegations involve "an unconstitutional policy or custom . . . the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's rights." *Burgaz*, 30 F.4th at 1190 (quoting *Garcia v. Salt Lake Cty.*, 768 F.2d 303 (10th Cir. 1985)). "In situations where the municipal customs devolve responsibility across multiple officers, the customs may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation." *Burgaz*, 30 F.4th at 1190 (citing *Crowson*, 983 F.3d at 1191) (internal quotations omitted).

As explained above, the Court has determined that, as a matter of law, none of the Individual Defendants committed a constitutional violation. Accordingly, unless this is the "unusual" situation where "municipal liability may exist without individual liability," the County cannot be held liable under § 1983. *Lucas*, 58 F.4th at 1144. Plaintiffs, however, have neither argued a systemic failure theory of municipal liability nor established facts "to demonstrate that any policy or custom was causally connected to . . . a systemic violation carried out by multiple actors." *Lucas*, 58 F.4th at 1144.

In their response brief, Plaintiffs devote only one paragraph to opposing Defendants' motion for summary judgment on their municipal liability argument, and cite no law therein to support their claim that the County can be held liable for its "custom and policy of violating constitutional rights." Doc. 94 at 20. Plaintiffs vaguely refer to a "climate of deliberate indifference to the needs of the mentally ill," and assert that this climate "directly led to Mr. Padilla's suicide." *Id.* Nowhere, however, do they provide any facts to explain what they mean by such a "climate," or identify the causal connection between it and Mr. Padilla's suicide.

The only arguably specific assertion Plaintiffs include is that RCDC administration "knew that it did not have an adequate suicide prevention program and mental health services delivery system." *Id.* This assertion, however, is unsupported and indeed belied by the record, as the undisputed facts show that Officer Lavalle and Lieutenant Vigil each received suicide prevention training. Specifically, Administrator Porter testified that officers receive an initial training during their academy training, followed by an annual refresher. Doc. 94-6 at 18, 47:17-24. Consistent with this, Officer Lavalle testified that he completed a one- to two-hour suicide prevention training when he first started the job in December 2019, and then took another in March 2020. Doc. 83-4 at 2-3, 12:25-13:16. This training included audio-video classes, accompanying written materials, quizzes, and then a final test at the end. *Id.* It is likewise undisputed that Lieutenant Vigil "had received annual suicide prevention training, including in 2020." Doc. 83 at 5, ¶ 30; Doc. 94-6 at 14, 37:6-8.

To the extent that Plaintiffs seek to pursue their municipal liability claim on either a failure-to-train theory or on the theory that the County's policies and customs were "the moving force" behind the deliberate indifference of the Individual Defendants, their claim is foreclosed by the Court's determination that none of the Individual Defendants committed an underlying

constitutional violation. *See Crowson*, 983 F.3d at 1186. To the extent that Plaintiffs seek to pursue their claim on the systemic theory that "medical policies and procedures" "devolved responsibility across multiple officers," thereby "fail[ing] to ensure that any single officer [was] positioned to prevent the constitutional violation," *Burgaz*, 30 F.4th at 1190, that claim is wholly unsupported by the record. Nowhere do Plaintiffs allege, much less prove, the existence of any policies or procedures that devolved responsibility across multiple officers, or that, acting pursuant to such policies or procedures, the officers' "combined actions or omissions somehow violated [Mr. Padilla's] rights." *Id.* There is simply no evidence in the record from which a trier of fact could conclude that the County maintained a custom or policy that caused "systemic violation[s] carried out by multiple actors." *Lucas*, 58 F4th at 1144.

In the absence of an underlying constitutional violation, and in the absence of evidence that this is the unusual situation where such an underlying constitutional violation is not required to hold a municipality liable, the Court finds as a matter of law that the County cannot be held liable under § 1983. The County thus is entitled to summary judgment in its favor on Plaintiffs' *Monell* claim.

3. <u>ADA and Rehabilitation Act Claims Against the County</u>

In Count III-ii, Plaintiffs assert claims against the County under Section 504 of the Rehabilitation Act ("RA") and Title II of the Americans with Disabilities Act ("ADA"). Doc. 18 ¶ 95-100. Specifically, Plaintiffs allege that Mr. Padilla is a qualified individual with a disability, because he suffered from depression, and that the County discriminated against Mr. Padilla in violation of the RA and the ADA by failing to provide benefits, services, and programs on account of his disability. *Id.* at 27-28, ¶¶ 96-98. Plaintiffs' RA and ADA claims fail as a matter of law.

First, the RA only applies to "any program or activity receiving Federal financial assistance," as well as Executive Branch and United States Postal Service programs. 29 U.S.C. § 794(a). It is undisputed that RCDC did not receive any federal funding during the operative period leading up to Mr. Padilla's death. *See* Doc. 83-8 at 2. Accordingly, the RA does not apply here, and Plaintiffs' RA claim must be dismissed on that basis.

Next, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish an ADA violation, a plaintiff must prove three elements: (1) "that he or she is a qualified individual with a disability"; (2) "that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity"; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Gohier v. Enright,* 186 F.3d 1216, 1219 (10th Cir. 1999) (alterations omitted). The second element can be established by showing either an "exclusion from or denial of benefits," or "discrimination." *J.V. v. Albuquerque Public Schools,* 813 F.3d 1289, 1295 (10th Cir. 2016). The third element requires that the plaintiff's disability be "a but-for cause of the alleged discrimination." *Crane v. Utah Dept. of Corr.*, 15 F.4th 1296, 1313 (10th Cir. 2021).

A detainee can bring a claim for denial of medical care under the ADA when they have "been denied services that have been provided to other prisoners." *Rashad v. Doughty,* 4 F. App'x 558, 560 (10th Cir. 2001) (unpublished). By contrast, "the failure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not [alone] constitute an ADA violation." *Id.*; *see also Hughes v. Colo. Dept. of Corr.,* 594

F. Supp. 2d 1226, 1241 (D. Colo. Jan. 15, 2009) (noting that courts have distinguished between claims of inadequate medical care "versus claims alleging that a plaintiff was discriminatorily precluded access to medical treatment altogether").

Even assuming *arguendo* that Plaintiffs could establish at trial that Mr. Padilla's diagnosed depression qualifies as a disability under the ADA, there is no evidence that Mr. Padilla was "denied services that have been provided to other prisoners." *Rashad*, 4 F. App'x at 560. Plaintiffs have presented no evidence that other inmates with depression or other mental health issues were provided access to services that were withheld from Mr. Padilla. Indeed, Plaintiffs have presented no evidence of other inmates' care at all, and nothing in the record indicates that they sought such evidence during discovery but were prevented from obtaining it. Moreover, the evidence shows that Mr. Padilla was granted access to medical care by Mr. Abril and Nurse Devou on multiple occasions over the term of his detention. Plaintiffs' assertions that the medical care they provided to Mr. Padilla was inadequate, while properly considered in the context of a Fourteenth Amendment claim, cannot equally form the basis of an ADA claim. *See id.*; *Hughes*, 594 F. Supp. 2d at 1241. Because Plaintiffs thus fail to present any evidence that Mr. Padilla was denied access to services that were provided to other detainees, his ADA claim fails as a matter of law.

4. <u>State Law Claims Against the County</u>

In Counts V-A and V-B, Plaintiffs assert claims against the County arising solely under state law, namely, claims under the New Mexico Tort Claims Act and loss-of-consortium claims. The Court's pendent jurisdiction over these state law claims "is exercised on a discretionary basis," and the Tenth Circuit has generally held that "[i]f federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (citations

omitted). The Tenth Circuit has explained its general disinclination "to exercise pendent jurisdiction in such instances because notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Id.* at 1230. Applying this precedent, the Court finds that Plaintiffs' state law claims are best left for the state court's determination. *Id*. Accordingly, the Court declines to exercise jurisdiction over Plaintiffs' remaining state law claims and will dismiss them without prejudice. *Id.*

**CONCLUSION**

Like all correctional facility suicides, Mr. Padilla's death was a tragedy. However, for the foregoing reasons, there is no vehicle for those who love him and grieve his absence to obtain relief in federal court. Specifically, the Individual Defendants are entitled to summary judgment in their favor on the basis of qualified immunity and the County is entitled to summary judgment in its favor on Plaintiffs' municipal liability claims and their ADA/RA claims. As the federal claims remaining in this case are thus subject to dismissal, the Court declines to exercise jurisdiction over Plaintiffs' remaining state law claims.

Additionally, for the foregoing reasons, the expert testimony of Dr. Daniel is admitted in part, consistent with this Opinion.

**IT IS THEREFORE ORDERED** that County Defendants' Motion in Limine to Exclude Opinions of Dr. Anasseril E. Daniel and Notice of Joinder in Motion to Exclude Plaintiff's Expert William Patterson, III [Doc. 89] is **GRANTED** in part and **DENIED** in part, consistent with this Opinion.

**IT IS FURTHER ORDERED** that County Defendants' Motion for Summary Judgment Requesting Dismissal of Counts I, III, V, and VI [Doc. 83] is **GRANTED**, as follows: Counts I

and III are **DISMISSED with prejudice**, and Counts V and VI are **DISMISSED without prejudice**.

DATED this 8th day of October 2026.

MARTHA VÁZQUEZ
Senior United States District Judge